MILWAUKEE BREWERS BASEBALL CLUB, a
Wisconsin limited partnership, Milwaukee
Brewers Baseball Club, Inc., Raymond Elwood
Jackson and Ray Jackson's, Inc., Plaintiffs-
Appellants and Cross-Respondents,

v.

Wisconsin DEPARTMENT OF HEALTH &
SOCIAL SERVICES, and Linda Reivitz,
Defendants-Respondents and Cross-Appellants-
Petitioners.

Supreme Court

*No. 85–0164. Argued November 25, 1985.—Decided May 12,
1986.*

(Also reported in 387 N.W.2d 254.)

81

For the petitioners the cause was argued by *Robert W. Larsen,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the plaintiffs-appellants and cross-respondents there was a brief by *David E. Beckwith, Michael A. Bowen, Leonard G. Leverson* and *Foley & Lardner,* Milwaukee, and oral argument by *Mr. Beckwith.*

Amicus curiae brief was filed by *Brady C. Williamson, Brett A. Thompson, Lawrence Bensky* and *La Follette & Sinykin,* Madison, for the Wisconsin Senate and

its majority leader and for the Wisconsin Assembly and its speaker.

BABLITCH, J. The 1983 budget bill, more than 400 pages long, is an omnibus bill dealing with a broad range of unrelated topics. The plaintiffs (hereinafter, "the Brewers") challenge three provisions of the bill: 1) sec. 46.05(1o)(a), Stats., which requires the Wisconsin Department of Health and Social Services (DHSS) to build a prison in the Menomonee Valley; 2) 1983 Wis. Act 27, sec. 2020(32m)(f), which forbids the DHSS to hold a contested case hearing on the final Environmental Impact Statement (EIS) for the prison; and 3) sec. 46.0435(3) which established special standards for judicial review of the administrative procedures relating to the prison. The Brewers argue that these provisions violate art. I, sec. 1 of the Wisconsin Constitution which guarantees equal protection of the law, as well as art. IV, sec. 18 of the Wisconsin Constitution relating to private or local bills.[1] The court of appeals held that the siting provision, sec. 46.05(1o)(a), violates art. IV, sec. 18 dealing with private or local bills. We agree with the Brewers that the two provisions which relate to special administrative and judicial review procedures violate the Wisconsin Constitution's guarantee of equal protection, and they are therefore stricken. We conclude that the

---

[1] Article I, sec. 1 provides: "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to serve these rights, governments are instituted, deriving their just powers from the consent of the governed."

Article IV, sec. 18 provides: "No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title."

provision which directs DHSS to construct the prison in the Menomonee Valley does not violate the Wisconsin Constitution in either respect.

Although this opinion preserves the legislative provision which directs the DHSS to construct a prison in the Menomonee Valley, construction cannot begin until the Brewers have been given the full protection of Wisconsin Environmental Policy Act (WEPA) and judicial review procedures, many of which have previously been denied them. If the legislature chooses to persist in its directive to the DHSS, it may only fashion such special procedures as are consistent with the constitutional guarantees of equal protection of the law.

This opinion also addresses the issue of what constitutes a private or local law. We hold that the siting provision does not violate the constitutional provision of art. IV, sec. 18. We further hold that the constitutional mandate of art. IV, sec. 18 of the Wisconsin Constitution acts to inform the legislature that if it desires to enact legislative provisions that are specific as to any location, individual, or entity, it must do so in a separate bill under separate title. The only exception art. IV, sec. 18 allows is for provisions whose general subject matter is a state responsibility of statewide dimension. Even for those provisions, enactment must have direct and immediate effect on a specific statewide concern or interest. Then, and only then, is the inclusion of the provision in a differently titled bill constitutionally acceptable.

## I. EQUAL PROTECTION

"[T]here is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. . . . Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation." *Railway Express v. New York*, 336 U.S. 106, 112–13 (1949). (Jackson, J., concurring.)

Most citizens agree on the urgent need for more urban prisons but only if, as the political history of prison siting in this state unfortunately reveals, the prisons are built in "someone else's backyard." Quite obviously, if an urban prison is built, it must be built in somebody's backyard. The legislature in the 1983 budget bill, in response to the critical need for prison space, took two actions. First, it designated who was to have a prison constructed in their backyard. Second, it directed that those who were to have that prison in their backyard would have significantly fewer rights of environmental review than all other citizens who might challenge prison construction elsewhere in the state.

Unquestionably the legislature had the right to place a prison in somebody's backyard, be it the Menomonee Valley or anywhere else.

However, of the 23 correctional institutions recommended for construction by the Flad Report (16 of which were for southeastern Wisconsin), the legislature singled out only one—the Menomonee Valley prison—for special treatment. It is only those persons with standing to oppose this one specific site in the Menomonee Valley who are governed by the truncated ju-

dicial and administrative procedures applicable to review of the environmental impact of the site. We conclude these provisions which articulate this special treatment violate the Wisconsin Constitution's guarantee of equal protection of the law.

The facts are undisputed. In 1976, the state commissioned Flad and Associates, Inc. to develop a Six Year Master Plan which addressed the state's correctional needs through 1985. The 1977 Flad Report was a comprehensive document which included projections of future inmate populations and recommendations on policy changes, facility improvements, and additions.

Specifically, the Flad Report based its findings on the needs of the existing probation and parole regions in the state numbered 1–5. Region numbers 2 and 3, referred to in the Flad Report as the "southeast section of Wisconsin," consist of the counties of Milwaukee (region 3), and Kenosha, Racine, Waukesha, Walworth, Washington and Ozaukee (region 2). Together the populations of these counties total approximately 1.76 million people, roughly 35 to 40 percent of the state's entire population.

The Flad Report emphasized the need for correctional facilities for the southeast section of the state:

> "2. The present system is institution-based, not community-based. In the past, institutions were located in rural areas. Today, with trends toward urbanization, correctional facilities should be located to serve this population.
>
> "The southeast section of Wisconsin is contributing the majority of offenders to the system. The major existing facilities, however, are located in the northeast section of the state, distant from the com-

munities (such as Milwaukee County) which contribute the majority of inmates." Flad Report p. 11.

The Flad Report recommended building 23 new correctional institutions in the state. Consistent with its emphasis on the need for correctional facilities in the southeastern section of the state, it recommended that the state construct 16 of the 23 new facilities in the southeastern section. It recommended siting ten of these in region 3, Milwaukee county, and six in region 2.[2]

In the 1983 budget bill the legislature declared that the establishment of a state correctional facility, including any new metropolitan correctional institution, was a matter of general, statewide interest. The legislature added that "... prison overcrowding is a critical problem in this state which restricts the options available to judges, prosecutors, and prison officials." 1983 Wis. Act 27, sec. 2020(32g)(a). The legislature concluded that the siting of a new metropolitan correctional institution "... necessitates an expedited environmental review process and will require the direct action of the legislature in establishing the site ...." 1983 Wis. Act 27, sec. 2020(32g)(b).[3]

---

[2] For region 2, the Flad Report recommended four residential centers, one community correctional center, and one maximum security institution. For region 3, it recommended six residential centers, two community correctional centers, one medium security institution and one maximum security institution. Flad Report p. 228.

[3] The legislature set forth its findings in 1983 Wis. Act 27, sec. 2020(32g), as follows:

"(32g) NEW METROPOLITAN CORRECTIONAL INSTITUTIONS: LEGISLATIVE FINDINGS. (a) Prison findings. The legislature finds that prison overcrowding is a critical problem in this

Accordingly, in the 1983 budget bill, the legislature directed the DHSS to build a correctional institution at a specific site in Milwaukee county. The DHSS is the state agency charged with responsibility for prison construction and the environmental review of the impact of that construction. The language in the bill reads as follows:

". . . the department shall establish a correctional institution located in Milwaukee in the area bounded on the north by highway I 94, on the south and west by the Menominee [statutory spelling] river and on the east by 35th street on property

state which restricts the options available to judges, prosecutors and prison officials.

" (b) *WEPA reaffirmation.* The legislature reaffirms its commitment to the Wisconsin environmental policy act and the requirement that executive agencies conform to section 1.11 of the statutes and prepare environmental impact statements on major state actions significantly affecting the human environment. The legislature also recognizes that the issue of the siting of any new metropolitan correctional institution necessitates an expedited environmental review process and will require the direct action of the legislature in establishing the site for any new metropolitan correctional institution.

" (c) *Site selection.* The legislature recognizes its responsibility to consider environmental factors in designating the site for any new metropolitan correctional institution.

" (d) *Judicial considerations.* The legislature finds that the revised judicial review process and injunctive relief provisions are necessary to alleviate the problems described under paragraphs (a) and (b). The legislature requests that courts reviewing decisions under section 46.0435(2) of the statutes expedite the hearing of those cases to the fullest extent possible.

" (e) *Statewide concern.* The legislature finds that the overall organization of state correctional facilities is a matter of statewide concern. The establishment of any state correctional facility, including any new metropolitan correctional institution, is a matter of general, statewide interest to the public."

owned by the Milwaukee road railroad on March 28, 1983. The department may acquire additional land owned by the Milwaukee road railroad on March 28, 1983, on the west and south sides of and contiguous to the Menomonee river." 1983 Wis. Act 27, sec. 953p.

This location is the Menomonee Valley in the City of Milwaukee. This site is approximately a 6–square-block section directly adjacent to Milwaukee County Stadium. The southeast region to which the Flad Report refers is approximately 2,290 square miles.

Although the legislature reaffirmed its commitment to WEPA, the legislature also provided for what it termed "expedited" administrative and judicial review procedures applicable to environmental review of the site, by precluding the DHSS from holding a contested case hearing on the final FIS for "any new metropolitan prison." Instead, DHSS was to hold an informational hearing for the purpose of providing information and soliciting comments, material and testimony to assist the legislature and DHSS. 1983 Wis. Act 27, sec. 2020(32m)(f).

The legislature also directed the courts, as part of this "expedited" process, not to enjoin construction of such a facility due to alleged defects in the EIS unless the parties seeking the injunction proved ". . . by clear and convincing evidence that any defects" could not be remedied during the construction phase of the project. 1983 Wis. Act 27, sec. 953h(3).

These administrative and judicial review procedures were to apply to the construction of any new metropolitan prison which the legislature defined as ". . . any correctional institution in a city having a population of 500,000 or more the site for which is designated

by the legislature by statute on or after the effective date of this section (1983), but prior to January 1, 1985." 1983 Wis. Act 27, sec. 953h. At the time of the passage of the 1983 budget bill, only the Menomonee Valley site described above was included in the classification of "any new metropolitan prison."

The Milwaukee Brewers Baseball Club, which exhibits major league professional baseball games at County Stadium (owned by Milwaukee county) in Milwaukee, and Ray Jackson and Ray Jackson's, Inc., the individual and corporate owners of a restaurant located near County Stadium, brought suit against DHSS in Dane county circuit court, alleging that these provisions in the budget bill violate the Wisconsin Constitution.

There are two threshold questions to resolve before reaching the fundamental equal protection issue: first, did this legislation create a distinct classification of citizens; and second, if so, did this legislation treat the class significantly differently from all others similarly situated?

The answer to the first question is clear: the legislation created a very small, very distinct, and very closed class of citizens—those with standing to challenge the construction of a prison in the area bounded by 35th Street, Interstate 94 and the Menomonee River.

Language in the statute limits its application only to citizens of the City of Milwaukee and only to sites designated by the legislature between July 1, 1983, and January 1, 1985. Any sites in the City of Milwaukee designated before or after those dates are not affected. Regardless of the dates of construction, any other prison site located in Milwaukee county outside the

city limits, or anywhere else in southeastern Wisconsin, is not affected.

The practical effect of this law, however, particularly in view of language which prohibits the DHSS from acquiring ". . . any additional property for a correctional institution in the city of Milwaukee prior to January 1, 1985, unless the site is designated by the legislature" is to preclude application of this law to anyone other than a citizen with standing to challenge the Menomonee Valley prison. *See* sec. 46.05(1*o*)(a), Stats. Why this is so is apparent from the legislative history of prison siting for the southeastern section of this state. As the state points out in its brief, "[i]nitial efforts to locate a prison in southeastern Wisconsin, including legislation specifying the prison be built on one of three sites in Milwaukee were frustrated for political reasons." Reply brief at 13, citing ch. 221, sec. 353, Laws of 1979. (Footnote omitted.) With enactment of this law, the legislature took a stranglehold over the prison siting process in the City of Milwaukee, including taking unto itself the power of approving purchases by DHSS in the city for the purpose of prison construction. Thus, although the language of the law made attempts to confine the application to the city, it is apparent on the face of the act, as well as from the legislative history, that the application was even more restricted than that. At the time this law passed, it was sheer absurdity to believe that the legislature would, sometime prior to January 1, 1985, engage in the self-flagellation involved in any attempt to purchase land in the city for a prison, much less that it would designate an additional site in the city. Subsequent events, of course, have shown this to be true. This legislation had as its

target—its *only* target—the Menomonee Valley prison and those with standing to challenge it.

The second threshold question is whether the treatment of those within the class is significantly dissimilar from the treatment of those not within the class. This question deserves a thorough analysis. Spelling out in detail the dissimilarities of treatment allows a better perspective for consideration of the equal protection issue and the values which underlie that guarantee.

The dissimilarities in treatment are substantial: while the persons having standing in this case receive only an informational hearing in the EIS process, persons in the usual case are entitled to a contested case hearing.

Absent this special legislation, the Brewers would have been entitled to a contested case hearing. As the DHSS's regulations state, any person who meets the qualifications contained in sec. 227.064(1)(a)–(d), Stats., and who complies with certain procedures for requesting a hearing shall receive a contested case hearing on the issue of whether the EIS complies with requirements of sec. 1.11. HSS 35.11(4), Wis. Adm. Code.

Section 227.064(1)(a)–(d), Stats., provides for a contested case hearing, upon proper request, if:

> "(a) A substantial interest of the person is injured in fact or threatened with injury by agency action or inaction;
> "(b) There is no evidence of legislative intent that the interest is not to be protected;
> "(c) The injury to the person requesting a hearing is different in kind or degree from injury to the general public caused by the agency action or inaction; and

"(d) There is a dispute of material fact."

We have recently explained that this "clear and unambiguous" language "creates a residual hearing right" to serve "as a safety net." *Milwaukee Met. Sewerage Dist. v. DNR,* 126 Wis. 2d 63, 72–73, 375 N.W.2d 649 (1985). We conclude that the Brewers satisfy the four conditions of sec. 227.064(1)(a)–(d)

■

We have today, in *Milwaukee Brewers Baseball Club v. DHSS,* 130 Wis. 2d 56, 387 N.W.2d 245 (1986), held that the Brewers have standing to challenge in court the sufficiency of the final EIS. Page 59. That holding is predicated on the conclusion that the plaintiffs suffer injury, or the threat of injury, from the agency's action. Further, the Brewers' potential economic injuries are sufficiently "substantial" to satisfy the test of sec. 227.064(1)(a), Stats.

■

Secondly, there is no evidence of legislative intent to leave the Brewers' interests unprotected; to the contrary, this court has consistently concluded that the purposes of environmental protection acts include protection against the kinds of injuries to environmental and recreational interests which the Brewers in this case allege. *Fox v. DHSS,* 112 Wis. 2d 514, 525, 334 N.W.2d 532 (1983); *Hanly v. Mitchell,* 460 F.2d 640, 647 (2nd Cir. 1972), cert. denied, 409 U.S. 990 (1972). On this record, we see no intent of the legislature to withdraw such protection from the class which the Brewers represent. Therefore, we conclude that the test of sec. 227.064(1)(b), Stats., is satisfied.

■

That these plaintiffs have suffered or may suffer an "injury . . . different in kind or degree from injury

to the general public . . ." under sec. 227.064(1), Stats., is evident. These plaintiffs operate businesses immediately adjacent to the proposed site. Clearly their continuing economic success depends greatly on maintaining pleasant surroundings to which they can attract consumers spending discretionary entertainment dollars. Any injury to their economic interests, therefore, differs in kind and degree from any injury to the general public which may result from an adverse impact of the site on physical conditions in the area. For this reason, plaintiffs meet the test of sec. 227.064(1)(c).

Finally, we conclude that the Brewers satisfy the standard of sec. 227.064(1)(d), Stats., in several respects. They dispute a number of issues "of material fact" which underlay the DHSS's conclusions, such as its conclusions about the impact of the prison site on traffic congestion, emergency vehicle access and economic conditions in the area.

We do not find dispositive the plaintiffs' failure to file a formal request for a contested case hearing, as required in sec. 227.064(1), Stats., and HSS 35.11(4)(a), Wis. Adm. Code. Because the legislature had specifically exempted these plaintiffs from the right to a contested case hearing, there was no reason for them to request a hearing.

Having determined that, absent the special legislation at issue here denying them a contested case hearing, the Brewers would have been entitled to one, we turn now to the differences between an informational hearing and a contested case hearing. We conclude that the differences, both procedurally and substantively, are significant.

In a contested case, a party may call adverse witnesses. Section 227.07(3), Stats.; HSS 35.11(4)(c)3.a., Wis. Admin. Code. Not so in an informational hearing.

In a contested case, a party may conduct cross-examinations. Section 227.08(6), Stats. Not so in an informational hearing.

In a contested case, a party has the means of discovery, except written interrogatories and depositions on written questions, available through judicial proceedings set forth in ch. 804, Stats. Section 227.08(7); HSS 35.11(4)(c)2. Wis. Admin. Code. Not so in informational hearings.

In a contested case, the proceeding may be conducted under oath. Section 227.09(1)(a), Stats. Not so in an informational hearing.

In a contested case, the factual basis of the decision consists solely of the evidence and matters officially noticed. Section 227.07(9), Stats. Not so in an informational hearing.

Given the highly politicized nature of the issue in this case, it is also significant that *ex parte* communications—the definition of which, under sec. 227.13, Stats., could include comments by elected officials to the secretary of DHSS—are forbidden in contested cases, and it is material error when a party not notified of an *ex parte* communication is prejudiced by the inability to rebut facts presented and when improper influence upon the decision-making appears with reasonable certainty. *Seebach v. Public Service Commission,* 97 Wis. 2d 712, 721, 295 N.W.2d 753 (Ct. App. 1980). We raise this point, not to allege its occurrence, but to highlight yet another distinction between a contested case and an informational hearing. As this court has previously said, "[t]he absence of such recog-

nized judicial safeguards as the right to cross-examine and also the ability of the commission to base its opinion upon *ex parte* evidence heavily burdens the position of one who disagrees with the conclusions of an administrative agency after a legislative-type hearing." *Ashwaubenon v. Public Service Comm.*, 22 Wis. 2d 38, 47, 126 N.W.2d 567 (1963).

An additional critical distinction between the classes is that challengers to the Menomonee Valley prison are not able to obtain an injunction or temporary restraining order, stay or other provisional remedy or any extraordinary remedy from a circuit court unless they prove "by clear and convincing evidence" that defects in DHSS's compliance with sec. 1.11, Stats., or 1983 Wis. Act 27, 2020(32m) cannot be remedied during the construction phase of the project. In contrast, challengers to other prison sites are able to obtain such relief from a reviewing court upon ". . . such terms as it [the court] deems proper. . . ." Section 46.0435(3) and sec. 227.17. This is a restriction of the circuit court's equitable powers which, in many instances, would disadvantage the class to which it applies.

Having established the creation of a narrow class of citizens whose treatment under the law is significantly dissimilar from all other citizens who might challenge prison construction elsewhere in the state, we turn now to the fundamental issue, equal protection.

The Brewers contend that the prison siting legislation violates the equal protection guarantee by placing Milwaukeeans opposing the Menomonee Valley site in a class apart from persons opposing all other prison sites within or outside the boundaries of Milwaukee.

It is only those persons with standing to oppose this one specific site in the Menomonee Valley who are governed by the truncated judicial and administrative procedures applicable to review of the environmental impact of the site.

Relying exclusively on the five factor test set forth in *Harris v. Kelley,* 70 Wis. 2d 242, 234 N.W.2d 628 (1975) for measuring the reasonableness of a legislative classification under the state constitution's equal protection guarantee, the Brewers argue that the classification in the prison review legislation is unconstitutional. The *Harris* court set forth the following five factors:

> "(1) All classifications must be based upon substantial distinctions which made one class really different from another.
>
> "(2) The classification adopted must be germane to the purpose of the law.
>
> "(3) The classification must not be based upon existing circumstances only and must not be so constituted as to preclude addition to the numbers included within a class.
>
> "(4) To whatever class a law may apply, it must apply equally to each member thereof.
>
> "(5) The characteristics of each class could be so far different from those of other classes as to reasonably suggest at least the propriety, having regard to the public good, of substantially different legislation." *Harris* at 252.

While the plaintiffs rely exclusively on the five factor test, a review of the origins of this test and its application reveals that the test is not the exclusive standard for determining whether a classification violates the state constitution's equal protection guarantee. As

97

the *Harris* court acknowledged, the five factors are merely aids in applying the general principle that ". . . a classification, though discriminatory, is not arbitrary or capricious, and therefore not violative of the equal protection requirement, if any statement of facts reasonably can be conceived which will sustain it." *Harris* at 254.

Thus, while the five factor test provides a useful analytical tool, it is not *per se* determinative. The basic question is whether there is a reasonable basis to justify the classification.

■
"If a statutory classification does not involve a suspect class or a fundamental interest, it will be sustained if there is any rational basis to support it. *State v. Hart,* 89 Wis. 2d 58, 64–65, 277 N.W.2d 843 (1979). Under those circumstances, equal protection is denied only where the legislature has made an irrational or arbitrary classification. *Id.* "The basic test is not whether some inequality results from the classification, but whether there is a reasonable basis justifying the classification." *Omernik v. State,* 64 Wis. 2d 6, 19, 218 N.W.2d 734 (1974). *State v. Bleck,* 114 Wis. 2d 454, 468–69, 338 N.W.2d 492 (1983). *See also, Voit v. Madison Newspapers, Inc.,* 116 Wis. 2d 217, 225–26, 341 N.W.2d 693 (1984); *State v. Asfoor,* 75 Wis. 2d 411, 249 N.W.2d 529 (1977); *State Bank of Drummond v. Nuesse,* 13 Wis. 2d 74, 108 N.W.2d 283 (1961); *State ex rel. Hickey v. Levitan,* 190 Wis. 646, 210 N.W. 111 (1926); *Maercker v. Milwaukee,* 151 Wis. 324, 329, 139 N.W. 199 (1912).

■
A legislative classification is presumed to be constitutional. The presumption of constitutionality im-

plies that insofar as the constitutionality of legislation depends upon facts, the facts are presumed to exist until shown otherwise. Hurst, *Dealing with Statutes 3* (1982); Hurst, *The Functions of Courts in the United States, 1950–1980,* 15 Law & Soc. Rev. 401, 455–62 (1980–81). The burden is on the challenger to prove unconstitutionality beyond a reasonable doubt.

The basic test is not whether some inequality results from the classification but whether there exists a rational basis to justify the inequality of the classification. Any reasonable basis for the classification will validate the statute. A statute will be declared violative of equal protection only when the legislature has made an irrational or arbitrary classification, one that has no reasonable purpose or relationship to the facts or a proper state policy. *Omernick* at 18–19; *Simanco, Inc. v. Department of Revenue,* 57 Wis. 2d 47, 57, 203 N.W.2d 648 (1973). When a court concludes that a portion of a legislative enactment is unconstitutional, it may sever that portion and declare the remaining portion constitutional. *Bence v. Milwaukee,* 84 Wis. 2d 224, 233, 267 N.W.2d 25 (1978).

We, therefore, turn to the question of whether there was a rational basis for these legislative actions. The legislature's actions here were twofold. First, the legislature directed that a prison be constructed in the Menomonee Valley. Second, the legislature directed that a truncated WEPA and judicial review process apply to those who might challenge the Menomonee Valley prison, thereby singling them out from all others who might challenge other prison construction in the state. In other words, the objective was a prison in

downtown Milwaukee in order to meet the critical statewide need for more prison space; the means chosen to reach that objective was a truncated WEPA and judicial review process. (For a discussion of the range of findings and choices implicit in a statute, *see* W. Hurst, *Dealing With Statutes* at 78–81). We conclude there is no rational basis, articulated in the statute or otherwise, to support the means which the legislature chose to accomplish its objective.

The state argues that the legislature articulated a credible rationale for both of its actions. However, the *only* rationale which is "articulated" within the statute is the legislative finding that "[t]he legislature finds that prison overcrowding is a critical problem *in this state* ...." 1983 Wis. Act 27, sec. 2020(32g)(a). (Emphasis added.) In section 2020(32g)(e) of the Act, we are told that "[t]he legislature finds that the overall organization of state correctional facilities is a *matter of statewide concern.*" (Emphasis added.)[4] That "articulated" rationale supports *only* the first action of the legislature, i.e., building a prison in the Menomonee Valley; it gives no support whatsoever to the second action of the legislature, i.e., singling out the Menomonee Valley challengers for dissimilar treatment.

---

[4] The legislature also listed under the title "Legislative Findings," first, its reaffirmation of its commitment to WEPA; and, second, its conclusion that ". . . the issue of the siting of any new metropolitan correctional institution necessitates an expedited environmental review process ...." 1983 Wis. Act 27, sec. 2020(32g)(b).

With respect to the first point, a reaffirmation of its commitment to WEPA can scarcely be used to credibly support a denial of basic rights under WEPA. With respect to the second point, the legislature cites no rationale, other than the critical statewide need for prisons, to support this conclusion.

The state, by relying on the articulated rationale in the statute as establishing a rational basis for treating Menomonee Valley challengers differently, is, in effect, saying that because prison overcrowding is a critical problem in this state, it is rational to treat Menomonee Valley challengers differently from all others. That proposition simply does not withstand analysis. The articulated rationale unquestionably provides a rational basis for the legislative action directing that a prison be built in the Menomonee Valley. But that is not the question.

The articulated rationale clearly would provide a rational basis for a truncated set of environmental and judicial review rules for *all* prison construction, had the legislature chosen to so direct, but that is not the question either.

The question is whether the articulated rationale, i.e., the critical statewide need for prison space, provides a reasonable basis to deny rights to Menomonee Valley challengers. It does not. There are critical links that are missing. There must be more. The statute, however, provides no more.

The state urges us to construct those critical links by relying on the Flad Report. The legislature, however, relied solely on the articulated rationale of the critical statewide need for prison space. The legislature articulated no other basis, such as the Flad Report, for its actions. Had the legislature not chosen to articulate its rationale, we would be obligated to construct one if possible. *Sambs v. City of Brookfield,* 97 Wis. 2d 356, 371, 293 N.W.2d 504 (1980).

However, here the legislature did declare its rationale, which thereby arguably presents a different burden on the challenger and a different review for us:

101

"One may fairly question whether, if the challenger rebuts the declared rationale, he should be required to go further and offer rebuttal to other conceivable bases for the act which the legislature did not choose to mention. The Supreme Court has not spoken plainly to this point, but some opinions indicate that the Court may require of the challenger that he rebut only the justification which the statutory text explicitly sets out. There is a caution here for draftsmen. The legislature does not violate the separation of powers by declaring its findings and justification in a preamble, and such a declaration, though not binding on the judges, may add substantial support to the presumption of constitutionality. But the presence of the preamble may also deny the statute the full range of supporting hypotheses which the court might be willing to invoke where the legislature has not committed itself to a specified rationale." Hurst, *Dealing With Statutes* at 94–95. (Footnotes omitted.) *See especially* p. 122 n. 66.

If we were to attempt to construct the missing links, notwithstanding the arguable lack of obligation to do so, the only source suggested by the state is the Flad Report. The state suggests no other.

The Flad Report does nothing more than supply the missing link which would support legislative action expediting the environmental and judicial procedure for all prison construction in southeastern Wisconsin. The Flad Report supports the proposition that the critical need for prison space exists in southeastern Wisconsin. It does not single out the City of Milwaukee (much less the Menomonee Valley within the City of Milwaukee) as having a special, critical need. The need, as

stated time after time in the Flad Report, is in southeastern Wisconsin.

As we understand the arguments of the state, it is saying: because there is a critical need for prison space in this state and because this need is most critical in southeastern Wisconsin (as supported by the Flad Report), it is therefore reasonable to treat those who object to the Menomonee Valley site differently from all other citizens in this state. For that proposition to be reasonable, there must be another critical link, but it remains missing. There is nothing in this record, nothing in the arguments submitted by the state, and nothing in the Flad Report to provide that critical link. The focus of the Flad Report is not on the City of Milwaukee. The Flad Report supports no such proposition, either literally or by implication. The need, as the Flad Report indicates, is in southeastern Wisconsin.

The absence of that critical link is fatal to the legislation. The legislature may well believe that the critical need is in the City of Milwaukee. What the legislature believes is not determinative; the test is not whether the legislature had a rationale. It will always have a rationale for anything it does. The test is whether the rationale is rational. If the concept of equal protection is to be meaningful, equal protection cannot be interpreted so as to allow the legislature to exercise its will on a minority of citizens anytime it desires so long as there is any rationale to do so, regardless of how remote, fanciful, or speculative the rationale may be. To be rational for the purpose of equal protection analysis, the legislative rationale must be reasonable. Put another way, ". . . in application to policies, projects, or acts, RATIONAL implies satisfactory to the reason or chiefly actuated by reason. . . ."

*Webster's Third New International Dictionary* 1885 (1961).

We conclude there is no rational basis to treat the Menomonee Valley prison differently from any other prison in southeastern Wisconsin. We do not dispute that prison overcrowding is a critical problem in this state which needs immediate resolution. Nor do we take issue with the modern theory of penology that the worthwhile goal of prisoner rehabilitation is best served when prisons are located close to the inmate's home community. And we endorse the goal of affirmative action in the hiring of prison personnel which, as a practical matter, is more easily accomplished in the more heavily urbanized areas of the southeastern part of this state. These societal goals, however, are not limited to the neighborhood of 35th Street and the river; the truncated WEPA and judicial review procedures are. The urgency of prison construction does not end at the neighborhood of 35th Street and the river; the truncated WEPA and judicial review procedures do. It is this unequal treatment we find to be without rational basis and thus violative of sec. 1, art. I of our constitution.

We recognize that the legislature, in attempting to remedy perceived problems, is not required to strike at all problems at the same time. *Omernick* at 20. As Justice Heffernan wrote for the majority in *State ex rel. Harvey v. Morgan,* 30 Wis. 2d 1, 139 N.W.2d 585 (1966):

> "We have previously held that in all legislative classifications there are always cases *just within* and *just without* the borderlines. Undoubtedly, in most classifications the line of demarcation fixed by the legislature is not the only one that could have been selected. *Within the limits of what is reason-*

*able* it is for the legislature and not for the court to determine the exact point at which a classification is to operate. A beginning must be made somewhere, and it is a legislative function to determine it. If that determination is reasonable in accordance with the tests of classification that have been established judicially over the years, this court will not hold it invalid." *State ex rel. Harvey* at 9. (Footnote omitted.) (Emphasis added.)

However, the line of demarcation which the legislature established here separates the Menomonee Valley area from the rest of the southeastern section of the state. It can scarcely be argued that this site is "just within" or "just without" the "borderlines" of southeastern Wisconsin, much less the entire state.

When the state argues that "[t]he obvious reason for choosing southeastern Wisconsin is because that is where the population is concentrated . . . ," it is arguing that population characteristics of the area are the major reason to establish prisons in the area. Reply brief at p. 13. Had the legislature established as its line of demarcation the boundaries of Racine, Kenosha or Milwaukee counties, or just Milwaukee county alone, a more difficult legal question would be presented. It did not.

Instead, the legislature chose to fix a very small, very precise parcel of land as the exact locus of the classification. Persons with standing to challenge a prison on the 1-square-mile parcel where 35th Street meets the Menomonee River have less protection than do persons with standing to challenge a prison anywhere else in the state. They have less protection than do persons in the 2,290-square-mile southeast section. They have less protection than do persons anywhere else in the

241-square-mile county of Milwaukee. They even have less protection than do persons located a few blocks away, who might challenge a future prison designated for the other side of the interstate.

We are neither unaware nor unsympathetic to the inordinate political difficulties of prison siting. Society faces many difficult problems, in addition to prisons, that are the ultimate responsibility of government to resolve. Unfortunately, many people want these difficult problems dealt with at someone else's burden. It is precisely because of this attitude that the guarantee of equal protection of the law is essential, lest the problems of the many are resolved at the expense of the few.

The legislature must have a rational basis to support the dissimilar treatment given here, or else it must fall under the weight of the guarantee of equal protection. We find no rational basis for the distinction, and accordingly conclude that sec. 46.0435(3), Stats., relating to injunctions and other remedies, and 1983 Wis. Act 27, sec. 2020(32m)(f), relating to environmental impact hearings, in their entirety, violate the Wisconsin Constitution's guarantee of equal protection of the law.

## II. PRIVATE OR LOCAL

We turn now to the final issue.

Once more we are forced to address the recurring problem of what constitutes a private or local law within the meaning of art. IV, sec. 18 of the Wisconsin

Constitution.[5] This is not the first time this court has been called upon to resolve this question, nor, presumably, will it be the last. We were forthright in acknowledging in *Soo Line R. Co. v. Transportation Dept.,* 101 Wis. 2d 64, 303 N.W.2d 626 (1981) that deciding what is a private or local law has been difficult and that an accurate, comprehensive definition of the phrase "private or local" has eluded this Court and other states. *Id.* at 73.

The resolution of this issue is important to the legislature as it confronts, and is forced to decide, the myriad of proposals presented to it. Society, government, and the legislative process have become increasingly complex. Nowhere is this seen more dramatically than in the state budget bill and the process by which that bill becomes law.

However, we do not address here the process by which the budget bill becomes law. That process has been criticized and defended by friend and foe alike. The legislature is the determiner of its own process, subject only to the will of the electorate, which elects the members, and the constraints of the constitution. Hurst, *Dealing With Statutes* at 23, 25, 52. We address only the contraints of the constitution, specifically art. IV, sec. 18.

Article IV, sec. 18 was adopted as part of the original constitution of 1848 and has remained unchanged. Treatises on the subject, and cases analyzing it, reveal three underlying purposes of art. IV, sec. 18: 1) to encourage the legislature to devote its time to the state at large, its primary responsibility; 2) to avoid the spec-

---

[5] Article IV, sec. 18, Wis. Const., provides: "No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title."

ter of favoritism and discrimination, a potential which is inherent in laws of limited applicability; and 3) to alert the public through its elected representatives to the real nature and subject matter of legislation under consideration. These purposes were well stated recently in *Soo Line*. Justice Abrahamson, writing for the court, said:

"State constitutional provisions regulating private, local, and special legislation were adopted in response to the changing conditions in which 19th century state legislatures found themselves. State legislatures were under pressure from their constituents to act on a multitude of subjects. The volume of laws drastically increased, and private or local laws dramatically outnumbered the general laws. The proliferation of laws of limited applicability created the specter of favoritism and discrimination and diverted the legislature's attention from matters of public, state-wide importance. The constitutional proscriptions against special, private or local legislation were intended to prevent the granting of special privileges or the imposition of special disabilities and to encourage the legislature to devote its time to the interests of the state at large. Hurst, *The Growth of American Law: The Law Makers,* 30, 66, 79, 229, 233–34 (1950); Cloe & Marcus, *Special and Local Legislation,* 24 Ky. L.J. 351, 355–358 (1936). The constitutional limitations seek to insure that the legislature and the people of the state are advised of the real nature and subject matter of the legislation being considered to avoid fraud or surprise.

"Sec. 18, art. IV of the Wisconsin Constitution is designed to protect the public from legislative enactment of statutes whose effect is unknown to legislators and to the people of the state and to direct

the legislator's attention to the proposed law to forestall improvident legislation, fraud and surprise. This court expressed the reasoning underlying sec. 18, art. IV, Const., as follows:

" '. . . The framers of the constitution, in adopting sec. 18, art. IV, intended to guard against the danger of legislation, affecting private or local interests, being smuggled through the legislature under misleading titles, by requiring every bill affecting such interests to be under a title likely to call attention of the lawmakers to its character, and likewise the attention of the people affected, to the end that every member of the legislature may intelligently participate in considering such bill and all objections thereto may be presented.' *Milwaukee County v. Isenring,* 109 Wis. 9, 23, 85 N.W. 131 (1901)." *Id.* at 71–73.

■

The language of art. IV, sec. 18 is easily understood, difficult in application. To determine whether a law is "private," a court generally focuses on the application of the law to particular entities, including individuals. *See Soo Line* at 75–76. To determine whether a law is "local," this court has used several tests over the years. In *Milwaukee County v. Isenring,* 109 Wis. 9, 85 N.W. 131 (1901), the court focused on the geographic specificity of the challenged legislation explaining,

"[a]n act is 'general,' as contradistinguished from and inconsistent with 'local,' . . . only when its operation extends to the whole state, or perhaps to the whole of some class of localities therein. . . .

" '[I]f the act be local as to territory, no matter how public it may be in its character, it can contain

but one subject, and that must be expressed in the title.' " *Id.* at 19–20.

As we explained in *Soo Line,* this court supplemented its *Isenring* territorial definition of "local" in *Monka v. State Conservation Comm.,* 202 Wis. 39, 231 N.W. 273 (1930). In *Monka* the court reviewed a bill enacted by the legislature to control net fishing in Lake Michigan. The court concluded that the law was not local, even if it applied to certain state waters:

> "Are bills on subjects of such general and state-wide concern, which are enacted for the general welfare of all of the people of the entire state, merely 'local' because in their execution they operate territorially upon a particular section of the state only? If so, many of our fish and game laws, and enactments for the location, construction, and maintenance of state institutions at specified locations, are invalid because they have been enacted as general and not as merely local laws. Although under their provisions the execution of those laws is to occur only at some specified locality, the ownership of such institutions is in the state, for the use and benefit of the entire public, all of whom have a general interest and concern therein, as they also have in the wild animals and fish, title to which is likewise in the state, in trust for the public. All that is held by the state, as proprietor, trustee, or in some governmental capacity, is a matter of general and state-wide concern, wherever located, and whenever it constitutes the subject of proposed legislation the bill relating thereto is not merely a matter of local interest or concern, or a merely 'local' bill, within the meaning of sec. 18, art. IV, Const." *Id.* at 41–42.

*Monka* firmly established the principle that geographic or entity specificity does not automatically render a law "private or local" under art. IV, sec. 18, where the subject matter of the enactment is a responsibility of the state. *Soo Line* at 75. The *Monka* court considered the operation of a bill to extend to the whole state ". . . when the subject thereof is such that the state itself has an interest therein as proprietor, or as trustee, or in its governmental capacity, for the benefit or in the interest of the general public.' " *Soo line* at 75, citing *Monka.* Thus, we see in *Monka* the principle that geographic or entity specificity does not automatically render a law private or local if the general subject matter of the provision relates to a state responsibility of statewide dimension.

However, *Monka* does *not* establish the principle that a geographically or entity specific provision which relates to a state responsibility will always escape the proscription of art. IV, sec. 18. The *Monka* court was careful to point out that this "state-wide concern exception" does not include ". . . a bill which merely imposes a burden or confers a benefit upon specified persons or localities, which do not constitute a legitimate class for the purpose of general legislation under the established principles of classification of cities for such purpose." *Monka* at 46. Thus, we also see emerging in *Monka* the principle that even if the subject matter does relate to a state responsibility of statewide concern, the provision must be subjected to further scrutiny. That principle which began to emerge in *Monka* came through clearly in *Soo Line.*

In *Soo Line* the challenged budget review bill included a provision requiring the Soo Line Railroad to

establish an at-grade crossing at a specified location where the railroad's tracks crossed a state highway. The Department of Transportation had been unable to convince the Public Service Commission that an at-grade crossing was sufficient at the specified location. The Public Service Commission determined that the crossing should be an overhead crossing for safety reasons. A reviewing court subsequently upheld this determination. The legislative provision countermanded that determination and said that " 'Notwithstanding section 195.28 and 195.29 of the statutes or any order made thereunder. . . . The department of transportation and Soo Line Railroad Company shall establish an at-grade crossing. . . .' " *Soo Line* at 69. (Citation omitted.)

The general subject matter of the provision in *Soo Line* was construction of railroad crossings, unquestionably a subject matter of state responsibility of statewide dimensions. The state has responsibility for the safety of all railroad crossings in the state. Chapter 195, Stats. Nevertheless, the court concluded that the provision was a "private or local" law.

The analytical framework which the *Soo Line* court used is revealing. The subject matter of the provision—railroad crossings—was unquestionably a matter of state responsibility of statewide dimension. However, the court did not end its inquiry at that point. Noting that the burdens and benefits of these provisions were on a specific geographic location and a specific entity, the court went on and analyzed the provision both in terms of the espoused statewide concern of highway safety and in terms of the direct and immediate effect this railroad crossing would have on that concern. The Department of Transportation had ar-

gued that the railroad crossing would have an effect on highway safety, a matter of statewide concern. The court rejected the argument of the state. The espoused statewide concern of highway safety was of a relatively generic nature. Indeed most legislation is enacted under the state's relatively generic police power to protect or preserve the state's concern in the safety, health, welfare, morals, and security of the state's citizens. In *Soo Line,* the state's reliance on the relatively generic nature of the statewide concern was insufficient. Furthermore, the effect on highway safety in general was neither direct nor immediate. The court insisted on a more direct and immediate effect on a more specific statewide concern.

Thus, the basic principle that emerges from *Soo Line* is that a geographic or entity specific provision is not automatically validated by the fact that the provision relates generally to a subject matter of state responsibility of statewide dimension. The *Soo Line* court recognized that legislation relating to a specific location or entity inevitably imposed burdens or benefits on that entity or location. This in turn brought into issue the values and the purposes underlying art. IV, sec. 18. Thus, in order to assure that the specter of favoritism or discrimination was not present, and to assure that a provision of unknown subject matter was not "smuggled" through the legislature, the court insisted that the enactment of the provision have a direct and immediate effect on a specific statewide concern.

*Soo Line* also spoke to a distinction between art. IV, sec. 18 and art. I, sec. 1, relating to equal protection. In discussing the effects of the law in question, the *Soo Line* court concluded that the Soo Line Railroad had been especially burdened in two ways: 1) the Soo Line

Railroad, and only the Soo Line Railroad, was burdened with present and future costs of the crossing; and 2) the budget review bill subjected the Soo Line Railroad to a significant departure from normal rules generally applicable to projects of this nature. Having determined the separate classification and the dissimilarity of treatment, the court did not apply the rational basis test of equal protection analysis, but rather proceeded to determine whether the enactment of the provision would have a direct and immediate effect on a specific statewide concern. This is a critical distinction between art. IV, sec. 18 and art. I, sec. 1. As stated in the equal protection section above, a violation of equal protection occurs only if there is no rational basis for the dissimilar treatment of those within the classification. In a challenge brought under art. IV, sec. 18, it is not relevant to inquire as to whether a rational basis existed for the legislative provision.

From these cases, as well as the underlying purposes of art. IV, sec. 18, we conclude that there is an analytical framework that can be drawn to assist the legislature, and this court, in determining whether a legislative provision is a private or local law within the meaning of art. IV, sec. 18.

From *Isenring,* we learn that a "local" law focuses on the application of the law to particular geographic site, and a "private" law focuses on the application of the law to particular entities, including individuals. From *Monka* we learn that geographic or entity specificity does not automatically render a law private or local if the general subject matter of the provision relates to a state responsibility of statewide dimension. From *Soo Line* we learn that a geographic or entity specific provision is not automatically validated by the

fact that the provision relates to a general subject matter of state responsibility of statewide dimension. If the provision is geographic or entity specific, its enactment must have a direct and immediate effect on a specific statewide concern or interest.

Consistent with these principles and the purposes underlying art. IV, sec. 18, we hold that a legislative provision which is specific to any person, place or thing is a private or local law within the meaning of art. IV, sec. 18, unless: 1) the general subject matter of the provision relates to a state responsibility of statewide dimension; and 2) its enactment will have direct and immediate effect on a specific statewide concern or interest.

This test, which determines whether this type of specific provision is an exception to the separate bill requirement, is a two-part test. Both must be fulfilled in order for the provision to be an exception to the separate bill requirement. The general subject matter of the provision must relate to a state responsibility of statewide dimension. In addition, the enactment of the provision must have direct and immediate effect on a specific statewide concern or interest. By "specific" we mean more than a relatively generic interest or concern such as found in *Soo Line.* As we said earlier, most legislation is enacted under the state's relatively generic police power in the safety, health, welfare, morals, and security of the state's citizens. An appeal to those generic concerns or interests is insufficient; there must be more.

We conclude that this test will accomplish the underlying accountability objectives of art. IV, sec. 18. It removes the specter of favoritism or discrimination

from the legislation because the test, by requiring a state responsibility and a specific statewide concern or interest, assures that the focus is on the resolution of a statewide problem, rather than primarily a private or local problem. It assures that the public through its elected representatives will be alert to the real nature and subject matter of the provision, because the test requires not only that the provision address a matter of specific statewide concern, but that its effect also be direct and immediate. Such a provision by its very nature will generate widespread legislative attention and scrutiny prior to its enactment.

This test recognizes that general legislation which legitimately serves the public interest will often incidentally confer a benefit or burden on particular entities or locations. This test protects that legislation. The test also recognizes that the legislative process, including the budget bill process, is a process which requires compromise. However, in that process the special interests of the few are sometimes overrepresented and the particular interests of minorities are sometimes underrepresented.[6] Accordingly, this test is designed to guard against legislation which "smuggles" items which primarily serve the interests of a few into general bills, conferring benefits on the few which the legislature might not confer if it addressed the same issue in a bill on that subject only. At the same time the test is designed to guard against the legislature's "smuggling" items which serve a general need at the

---

[6] For discussion of the role of courts as a check on these legislative tendencies, *see* Hurst, *Dealing With Statutes* at 69–87; and N. Komesar, *Taking Institutions Seriously: Introduction to a Strategy for Constitutional Analysis,* 51 U. CHI. L. REV. 366, 373–380, 416–20 (1984).

special expense of the few into general bills, thereby burdening the few in ways which the legislature might avoid if compelled to address the same issue in a bill on that subject only. In short, this test does no more and no less than to require that legislators remain accountable to the electorate for all their actions, including those which touch the interests of the few, by treating general and "private or local" laws separately.

This test, applied to the facts of *Soo Line,* provides an example of its application. The legislative provision in *Soo Line* was both entity and location specific. The provision involved a matter of state responsibility of statewide dimension—the construction of railroad crossings. The espoused statewide concern for highway safety was not sufficiently specific, nor was the effect on statewide highway safety direct and immediate. The court correctly concluded that the legislative provision required a separate bill.

Having stated the test, we turn to an analysis of the legislation before us, in order to determine whether it is a private or local bill within art. IV, sec. 18. The legislative provision in the 1983 budget bill reads as follows:

"46.05(1*o*)(a) In addition to the institutions under sub. (1), the department shall establish a correctional institution located in Milwaukee in the area bounded on the north by highway I 94, on the south and west by the Menominee river and on the east by 35th street on property owned by the Milwaukee road railroad on March 28, 1983. The department may acquire additional land owned by the Milwaukee road railroad on March 28, 1983, on the west and south sides of and contiguous to the Me-

nominee river. The department may proceed to acquire the property specified under this subsection, except that if s. 85.09 applies the department shall proceed in cooperation with the department of transportation under s. 85.09(4g)(b). The department shall not acquire any additional property for a correctional institution in the city of Milwaukee prior to January 1, 1985, unless the site is designated by the legislature by statute." 1983 Wis. Act 27, sec. 953p.

The title of the 1983 budget bill made no reference to the Menomonee Valley prison.

This is the only provision to which we direct this analysis. We determined above that those provisions relating to the truncated WEPA process and the special judicial review violated the Wisconsin Constitution's guarantee of equal protection. Accordingly, we severed those provisions and they are no longer before us.[7]

We can scarcely conceive of a bill that is more geographically specific. As described by the court of appeals, the bill designated the prison site with a precision approaching a conveyancer's description. This conclusion, however, does not end our inquiry; it begins it.

We next determine whether the general subject matter of the provision is a matter of state responsibil-

---

[7] Section 990.001(11), Stats., provides:

"(11) SEVERABILITY. The provisions of the statutes are severable. The provisions of any session law are severable. If any provision of the statutes or of a session law is invalid, or if the application of either to any person or circumstance is invalid, such invalidity shall not affect other provisions or applications which can be given effect without the invalid provision or application."

ity of statewide dimension. All parties concede this point, and we agree. The general subject matter—the construction of a medium/maximum prison—is a matter of state responsibility of statewide dimension. It is the responsibility of the state to maintain a statewide prison system, including, when necessary, construction of new prisons.

Finally, we must determine whether the enactment of this provision will have direct and immediate effect on a specific statewide concern or interest. This, of course, requires a determination, first, whether there is a specific statewide concern or interest. The circuit court found, as a matter of fact, that "[b]uilding the Menomonee Valley prison affects not only Milwaukee County, but also the entire state by alleviating a serious problem of prison overcrowding and by promoting a fair system of judicial administration and law enforcement."

We agree. As stated in the state's brief, continued overcrowding affects the living and working conditions at correctional facilities throughout the state. The use of old and overcrowded facilities may very well adversely affect correctional and rehabilitation efforts. Inadequate facilities may result in inadequate security and increase risks to the prisoners, staff and citizenry. This is not the "relatively generic" type of statewide concern found in *Soo Line.* The legislature's finding in 1983 Wis. Act 27, sec. 2020(32g)(a) "... that prison overcrowding is a critical problem in this state," with which the circuit court agreed, is the specific type of statewide concern which we failed to find in *Soo Line.*

Thus, having determined this provision addresses a specific statewide concern or interest, we must resolve the final question of whether enactment of the

provision will directly and immediately affect that statewide concern. The answer is self-evident. The effect will be direct because the provision causes a prison to be built in the Menomonee Valley. It will be immediate because upon completion, the prison will immediately provide 450 spaces for prisoners, thereby immediately alleviating to a degree the crowded conditions at other state prisons.

Therefore, we conclude that this provision, because it relates to a matter of state responsibility of a statewide dimension, and because its enactment will directly and immediately effect the specific concern of overcrowded prisons, is constitutionally acceptable. The inclusion of the $51 million prison in the budget bill did not contravene the purposes underlying art. IV, sec. 18. The focus of the bill was on a matter of statewide concern, not a private or local concern. Given the nature of the concern, and the direct and immediate effects this provision had on that concern, the elected representatives of those members of the public affected by this provision had to be aware of it. After six years of struggle, a $51 million prison in the heart of Milwaukee could scarcely be "smuggled" through the legislature in any manner, shape, or form. The real nature and subject matter of this provision had to be known, and this, in turn, assured accountability. A legislator representing the affected area, who voted for the budget with this item included, could not with any credibility assert to a questioning constituent that the legislator did not know the prison was a part of the budget bill. Thus, the underlying purposes of art. IV, sec. 18, were met.

In the arguments made to this court, attention has been drawn to many other provisions contained within

past budget bills, particularly budget bills of relatively recent vintage. Arguably, many provisions contained in past budget bills do not pass constitutional muster of art. IV, sec. 18. Arguably, many provisions would not withstand analysis under the test outlined in this opinion. We have not been asked, however, to address any other provisions; whether we would do so is a hypothetical question which we do not answer.

We hope that this test will be a useful tool for both the executive and legislative branches of government as they contemplate the possible contents of future budget bills as well as other bills of general title. Many budget bills lie ahead. We are not unsympathetic to the demands which the complexity of modern day society and government place on the legislature. In meeting its responsibilities, the legislature is the determiner of its process, subject to the constraints of the constitution.

Article IV, sec. 18 is not meaningless constitutional gesture. This court has the responsibility to give it force and effect consistent with reason. Prior cases and the underlying purposes of it provide the basis for doing so. The constitutional constraints of art. IV, sec. 18 act to inform the legislature that, if it desires to enact a geographic or entity specific provision, it must do so in a separate bill under separate title. The only exception art. IV, sec. 18 allows is for provisions whose general subject matter is a state responsibility of statewide dimension. Even for those provisions, enactment must have direct and immediate effect on a specific statewide concern or interest. Then, and only then, is the inclusion of the provision in a differently titled bill constitutionally acceptable.

*By the Court.*—The decision of the court of appeals is modified, and, as modified, affirmed.

SHIRLEY S. ABRAHAMSON, J. *(concurring and dissenting).*[1] For those concerned solely with whether the prison is built near the Milwaukee County Stadium, this decision presents cause neither to rejoice nor to despair. The prison may be built at the Menomonee Valley site. Construction, however, has been delayed pending a full WEPA proceeding or further legislation. For those interested in judicial review and the relation of the legislature and the judiciary, this opinion presents cause for concern. In striking down legislation authorizing the speedy construction of the Menomonee Valley prison, the court has usurped the legislative function and engaged in judicial lawmaking.

I do not address the wisdom of the legislative decisions to build a prison in Milwaukee, to place the prison at the Menomonee Valley site, or to provide truncated WEPA and review proceedings. These are political issues for the legislature and the people.

I write because the majority decides this case as if the court were sitting as a legislature. This is the second time in less than two months that I object to the court's decision on these grounds, and I am troubled about the direction in which the court appears to be moving. Once again the court expounds not the state constitution or the statutes but its own view. With this opinion the court usurps the legislative prerogative to formulate and implement the public policy of this state

---

[1] I concur in that part of the decision upholding the prison siting provision and dissent from that part of the decision invalidating the review procedures.

regarding the location of prisons and the urgency of prison construction. We "denigrate the legislature or, alternatively, we, as a court, are invading an area of the law . . . which . . . is beyond the reach of a court. . . . Clearly the majority's strained interpretation is an invasion of the legislative prerogative." *State v. Willi-quette,* 129 Wis 2d 239, 268, 385 N.W.2d 145 (1986) (Heffernan, C.J. and Abrahamson, J. dissenting.)

The legislative goal is to build a new medium/maximum security prison in Milwaukee expeditiously while affording protection of environmental interests. Everyone agrees that there is urgency in building prisons in Wisconsin and that the legislature may provide a truncated WEPA process to expedite all prison construction in the state. Everyone agrees that the legislature may select Menomonee Valley in Milwaukee as the site for a prison. The dispute centers on whether legislation calling for a truncated WEPA process for this prison only is constitutional.

In applying an equal protection analysis, the court should set forth what it views as the legislative objective and the legislative means to reach this objective so that it may review whether the objective is legitimate and whether there is a rational relation between the objective and the means. The majority opinion fails to state clearly and consistently what it views as the legislative objective and means, and then confuses the legislative objective with the majority's narrowly stated legislative rationale. With this confused and confusing analytical framework, the majority nevertheless launches into an equal protection discussion. According to the majority, the constitutionality of this legislation turns on the legitimacy of the legislature's belief that special urgency attends the construction of

123

this prison.[2] The majority's determination of unconstitutionality hinges on the majority's reading of the Flad Report. As I see it, the majority misreads the Flad Report.

The standard of review for determining the constitutionality of this legislation is a minimal, relatively relaxed rational basis test. This legislation does not intrude on any fundamental rights and does not create any suspect classification. This legislation does not involve an insular minority, a disadvantaged group, or a group that does not have a voice in the legislative process. This legislation does not impede human freedom. This legislation, contrary to the impression created by the majority, does not impose a unique or severe burden on any person or group of persons. The legislature has prescribed noncontested hearings in many instances, and both the contested and informational hearings provide interested persons with a fair, meaningful hearing. This prison siting legislation just adds another exception to the long list of exceptions to the contested hearing set forth in sec. 227.064, Stats. 1983–84. This court has not previously questioned the legislative authority to adopt exceptions to the contested hearing. See *Waste Management of Wisconsin v. DNR*, 128 Wis. 2d 59, 381 N.W.2d 318 (1986); *Milwaukee Metropolitan Sewerage District v. DNR*, 126 Wis. 2d 63, 375 N.W.2d 649 (1985).

---

[2] The way the court states the legislature's objective and the legislature's means of reaching the objective affects the rational basis equal protection analysis. *See* Tribe, *American Constitutional Law*, sec. 16–2 (1978); Tussman and tenBroeck, *The Equal Protection of the Laws*, 37 Cal. L. Rev. 341 (1949); *Developments in the Law: Equal Protection*, 82 Harv. L. Rev. 1065, 1076–1087 (1969).

In approaching an equal protection case like the one before us, a court exercises judicial restraint, giving great deference to the legislature. This deference reflects the court's awareness that establishing public policy which involves drawing lines and creating distinctions is a legislative task. Yet the rational basis test is not a toothless test. The equal protection guarantee will not be satisfied by implausible justifications for the statute.[3]

As the majority acknowledges, statutes are entitled to a presumption of constitutionality. The burden rests on those challenging the statute to prove unconstitutionality beyond a reasonable doubt.

Thus in this case the court is supposed to presume that facts exist which support the legislative determination that the urgency to build this prison differs from the urgency to build prisons elsewhere in the state. Pages 98–100. Only on proof beyond a reasonable doubt that there are no such facts should the court declare the law unconstitutional.

The Brewers attempt to carry this heavy burden by asserting that the urgency "of prison construction is equally applicable to all potential sites."[4] The Brew-

---

[3] This court and the United States Supreme Court have used numerous formulations for the rational basis test and have afforded the legislature different degrees of deference. See authorities cited in *County of Portage v. Steinpreis,* 104 Wis. 2d 466, 487, n.4, 312 N.W.2d 731 (1981) (Abrahamson, J., dissenting). *See also* Barnett and Cohen, *Constitutional Law—Cases and Materials* 652 (7th ed. 1985).

[4] The Brewers' brief sets forth the argument as follows:

"It is prison construction generally, pursuant to the Master Plan developed in 1977, which is urgent—not construction of a maxi-

ers assert that the legislature had no factual premise for deciding that the construction of this medium/maximum institution was especially urgent. In other words the Brewers assert that the objective of building a prison in Milwaukee expeditiously is not a legitimate legislative objective. To support their assertions the Brewers refer the court to the entire 315-page Flad Report, without citing any particular page, or any particular facts, figures, or discussion. If that is all the Brewers have to say, the Brewers should lose. They have not met their burden of proving the legislation unconstitutional beyond a reasonable doubt.

The majority overlooks the Brewers' failure to carry the burden and improperly shifts the burden of going forward with the evidence and the burden of persuasion to the state to prove that the need to build this medium/maximum security prison in Milwaukee is more urgent than the need to build prisons elsewhere in the state. To use the majority's phrase, the state must supply the missing "critical link." Pages 102–103.

The state supplies the critical link by relying on the same Flad Report cited by the Brewers. The state reads the report as supplying a factual basis supporting an urgency to construct a medium/maximum institution in Milwaukee.

The majority disagrees, however, with both the Brewers' and the state's reading of the Flad Report. The majority finds that the Flad Report supplies only

mum security prison in the Menomonee Valley alone . . . [T]he urgency of prison construction is equally applicable to all potential sites. [The urgency] might justify a special set of procedural rules for prison construction generally but it does not justify one set of rules for a prison being built in Milwaukee and a different set of rules for prisons to be built anywhere else in the state. . . ." Brewers' brief, pp. 40–42.

"the missing link which would support legislative action expediting the environmental review procedure for all prison construction in *southeastern* Wisconsin. The Flad Report supports the proposition that the critical need for prison space exists in *southeastern* Wisconsin." (Emphasis added.) Page 102. The majority states that the Flad Report refers to the "southeast section of Wisconsin" as Region 2 (Racine, Waukesha, Walworth, Washington and Ozaukee counties) and Region 3 (Milwaukee County). Page 86. No citation to the Flad Report is given. The majority finds that the Flad Report emphasizes the "southeast section of Wisconsin" and does not "single out the City of Milwaukee [the largest metropolitan center in southeastern Wisconsin] ... as having a special, critical need." Pages 102–103.

It is the majority, not the report, that emphasizes southeastern Wisconsin. It is the majority, not the report, that identifies the "southeast section of Wisconsin" by county, geographical area and population. In fact, the Flad Report infrequently uses the terms "southeastern Wisconsin" or "southeast section" and "southeast region" of Wisconsin and does not specify what regions or counties these geographical references include. The report does, however, consistently discuss the prison needs in Milwaukee (region 3) and the prison needs in each of the four other regions of the state. The regions are not described as geographical sections of the state. They are described by number (regions 1–5) and by the counties constituting each region. *See, e.g.,* Flad Report pp. 75, 78, 80, 122, 123, 228, 229.

The majority concludes that the legislature had no factual premise for believing that circumstances attending the construction of this prison require expedited proceedings. The majority reaches its conclusion

by sweeping aside and utterly disregarding those parts of the record supporting the urgency for a prison in Milwaukee.

The majority wrongly asserts that "nothing in the record, nothing in the arguments submitted in the state and nothing in the Flad Report" provides the critical link between prison needs in the state and an urgency for a prison in Milwaukee. Page 103.

The Flad Report does single out Milwaukee and does support an urgency for a prison in Milwaukee. The Flad Report clearly demonstrates that the need for new prisons is more critical in Milwaukee than in the other four regions of the state.

The report recommends—and the legislature adopts—the policy that new prisons should be located near the urban or metropolitan area that contributes the most inmates in order to facilitate the inmates' ties with family and community. Flad Report, p. 11. The report states that "the majority of residents [Wisconsin's inmate population] are from Milwaukee County," even though Milwaukee county itself represents "only 22% of the state total population." Flad Report, pp. 5, 74. It follows that the projected need for prison beds in the state, according to the Flad Report, is greatest in Milwaukee county. Flad Report, pp. 39, 78, 80, 82. The Flad Report projects the need for new prison beds in Milwaukee to be one and a half times the need of the rest of the state. Flad Report, pp. 40, 226–43.

This urgent need for prison beds in Milwaukee is reflected in the recommendations in the Flad Report. The report recommends a six-year plan for the construction of 23 facilities, 10 of which are to be located in Milwaukee county. Flad Report, p. 228. These 10 facilities would house approximately 60 percent of the

projected new prison beds. Flad Report, pp. 21, 228. Moreover, two of the three maximum and medium security institutions—one maximum security and one medium security—are to be located in Milwaukee county, housing approximately 60 percent of the state's new medium/maximum security beds. Flad Report, p. 228.

The growing crisis in prison space, the need to house prisoners in their home community, and the data in the Flad Report provide ample basis to hold that the expeditious construction of this medium/maximum prison in Milwaukee county is a legitimate legislative objective. The legislature's conclusion that there is a special urgency for a Milwaukee medium/maximum prison is reasonable and not irrational or arbitrary.

When the legislature passed the Menomonee Valley siting law there was no medium or maximum security institution in Milwaukee. There is still no such institution in Milwaukee today. The legislature's attempts to build a prison in Milwaukee before 1983, including building a prison at the Menomonee Valley site, had been frustrated. See, *e.g.,* ch. 221, sec. 353, Laws of 1979. Although other prisons may be needed in Milwaukee or in the state, the equal protection clause does not require the legislature to strike at all evils at the same time. The legislature may address itself to that phase of a problem which it views as most acute.[5]

---

[5] The legislature can experiment with different methods of achieving its goal. As long as the means chosen by the legislature rationally advance the legislature's objective, the court must disregard other methods that the judges as individuals would have preferred.

The record also provides a rational relation between the legislature's means—adopting a truncated WEPA process for this first medium/maximum prison in Milwaukee—and the legislature's objective. The legislature could reasonably conclude that a contested hearing would be so time consuming as to defeat the construction of this institution and that an informational hearing, such as was provided, would be sufficient to protect interested persons while expediting the process.

Judge Dykman, dissenting in the court of appeals, summarized the basis for the legislature's determination of special urgency for a medium/maximum prison in Milwaukee as follows:

> "The legislature could have concluded that the need for a prison in Milwaukee was so severe that, although several sites existed, *one* would be designated that would be as certain of success as possible. That site was the Menominee Valley site. Given the court's holding in *Outagamie County* [*Outagamie County v. Smith,* 38 Wis. 2d 24, 155 N.W.2d 639 (1968)], the legislature was not required to explain why it chose the Menominee Valley site as the site it wanted ahead of all others. The only question is whether a rational reason exists for the decision that at least *one* prison would be located in Milwaukee County. The substantial number of prisoners from Milwaukee County, the overcrowding in Wisconsin prisons, and the stated beneficial effect of locating a prison near prisoners' families are rational reasons why the legislature could determine that although many prisons were needed, one of them would be located in Milwaukee County.
>
> "The provisions of 1983 Act 27 pertaining to the procedure for building a prison at the Menominee

Valley site are rational ways to achieve that result. Appellants were not denied equal protection by the Menominee Valley prison siting provisions of 1983 Act 27."

While the majority purports to apply the rational basis test, it actually substitutes its judgment for that of the legislature.[6] Without justification the majority declares that the legislature acted in an arbitrary, unreasonable, or irrational manner in this case. The majority thus violates longstanding equal protection doctrine requiring the court to uphold legislation where there is a rational basis for legislative action even if the court does not agree with the legislature's fact-finding or the wisdom of the legislative act. The court has misperceived its role. The reviewing court is not a fact finder. The reviewing court must look for evidence supporting the legislation, and if it identifies conflicting evidence or if there is room for dispute, the court must uphold the legislation.

As I see it, the Brewers have not proved beyond a reasonable doubt that the legislature had no reasonable basis to believe that special urgency attends the construction of this prison. After hearing the testimony and reviewing the record the circuit court found that "Milwaukee's need for and difficulty in siting additional prisons differs substantially from those in the rest of the state—making reasonable different administrative and judicial remedies in considering the environmental impact." The record substantiates these findings and the court should not set them aside. I can-

[6] Compare this case with the application of the rational basis test in *North Side Bank v. Gentile,* 129 Wis. 2d 208, 385 N.W.2d 133 (1986).

not join the majority as it usurps the legislative function.

Turning to the question of whether the prison siting legislation is a private or local law within art. IV, sec. 18, of the Wisconsin Constitution, I conclude, as does the majority, that the prison siting legislation is not a private or local law. I am, however, distressed by the far-reaching implications of the opinion.

In the guise of interpreting art. IV, sec. 18, the court attempts to promulgate a legislative form manual. The court puts the legislature on notice that the court is readying its pens, pencils, and word processors to use art. IV, sec. 18, aggressively to monitor the legislative process. As to existing statutes, the court suggests that a myriad of statutes and the entire budgetary process are unconstitutional. As to future laws, the court warns that it will be peering over the legislators' shoulders ready to declare unconstitutional any provision in a statute or budget bill whose *form* does not comport with the form that the court thinks is required by art. IV, sec. 18.

Art. IV, sec. 18, regulates the form of a statute, not the substance. It does not prohibit the legislature from enacting private or local laws; it requires only that the legislature adopt private or local laws by means of separate, titled bills. Historically the court has had difficulty determining what is and is not a private or local law because many laws have, at one and the same time, private or local as well as statewide characteristics. Because no court, including this one, has developed a bright-line test to identify private or local laws under art. IV, sec. 18, and because the legislature has the power to enact private and local laws, the court should, in deference to the doctrine of separation of powers, ex-

ercise restraint in declaring laws unconstitutional under art. IV, sec. 18. As long as art. IV, sec. 18, remains in the constitution, the court should adhere to precedent and rely on art. IV, sec. 18, to invalidate a statute on the basis of the form of the statute only in exceptional cases like *Soo Line,* 101 Wis. 2d 64, 303 N.W.2d 626 (1981), where the private and local aspects are pervasive and only a general statewide interest is set forth.

Because the court's opinion poses a threat to the legislature's autonomy and the legislature's effective functioning as a separate, independent branch of government, I must disassociate myself from this part of the opinion.

In concluding I comment briefly on a final matter. On the face of the majority and dissenting opinions, this case appears to be a run-of-the-mill equal protection case in which the majority and dissent agree on the statement of the rational basis test but disagree on the application of the test to the facts. This is a simplistic reading of the majority opinion. The majority opinion presents a new, interesting twist in state constitutional equal protection law.[7] The court has, without

---

[7] Ordinarily a litigant challenging state action relies on the federal constitution and may "throw in" a reference to the analogous state constitutional provision. See Comment, *The Independent Application of State Constitutional Provisions to Questions of Criminal Procedure,* 62 Marq. L. Rev. 596, 620, n.145 (1979).

In this case the challenger—and thus the court—relies solely on the state constitution. A rare event.

Following precedent, the court uses the rational basis test under the state constitutional equal protection clause. The court has traditionally applied the minimal rational basis test to interpret the equal protection clause of the state constitution and has

discussion or explanation, given the state constitutional equal protection guarantee a new substantive

said that art. I, sec. 1 is substantially equivalent to the due process and equal protection clauses of the fourteenth amendment. *State ex rel. Sonneborn v. Sylvester,* 26 Wis. 2d 43, 49–50, 132 N.W.2d 249 (1965).

The Brewers, however, never urged the court to apply the rational basis test, which is used under the equal protection clause of both the federal and state constitutions. Indeed the Brewers carefully avoided any mention of this test or of the federal constitutional equal protection guarantee.

The Brewers probably did not claim a violation of federal equal protection because they were well aware that the United States Supreme Court's review of state regulatory legislation under the rational basis test is minimal, and this statute would in all probability pass muster. *See* 2 Rotunda, Nowak & Young, *Treatise on Constitutional Law: Substance and Procedure* ¶ 18.3 (1986); Nowak, Rotunda & Young, *Constitutional Law,* 590 et seq. (2d ed. Hornbook series 1983). Indeed if this court struck down the statute on federal equal protection grounds, the United States Supreme Court might summarily reverse or vacate this court's decision. *See, e.g., Idaho Dept. of Employment v. Smith,* 434 U.S. 100 (1977) (per curiam); *County Board v. Richards,* 434 U.S. 5 (1977) (per curiam), *reh'g denied* 434 U.S. 976 (1977) (per curiam).

The Brewers relied solely on the Wisconsin Constitution, arguing in effect that a "unique" test, the five-factor test, applies to the state constitution's equal protection guarantee.

The Brewers' principal argument under the five-factor test was that the prison siting legislation establishes an unconstitutional closed classification under the state constitution. While the court appears to have used the closed class factor to declare curative acts for municipalities unconstitutional under art. IV, secs. 31, 32 of the state constitution, the court has not treated a closed class as automatically unconstitutional under the state constitution's equal protection clause. *See Madison Metropolitan Sewerage Dist. v. Stein,* 47 Wis. 2d 349, 364–65, 177 N.W.2d 131 (1970); *Bence v. City of Milwaukee,* 107 Wis. 2d 469, 320 N.W.2d 199 (1982); Klitsner,

content that differs from that of the fourteenth amendment of the federal constitution. The use of the tougher equal protection test is a throwback to the *Lochner* substantive due process doctrine.[8] Only time will tell whether the court will follow this new, independent approach in interpreting the state constitutional guarantee of equal protection or whether this case is a sport.

For these reasons I do not join the majority opinion.

*Statutes—Special Legislation—Constitutional Prohibition Against Granting or Amending City Charters,* 1941 Wis. L. Rev. 396; Winters, *Classification and Municipalities,* 57 Nw. U. L. Rev. 279 (1962).

By relying on the state constitution, the Brewers could hope to accomplish two things. First, they might divert the court from applying the minimal rational basis test, a test that appeared to be a losing one for the Brewers. Although the court applies the rational basis test, surprisingly it holds for the Brewers. Second, the Brewers no doubt hoped that if the court held for them on the "unique" five-factor test under the state constitution, the court's decision would be insulated from review by the United States Supreme Court. This court, not the United States Supreme Court, is the final interpreter of the Wisconsin Constitution. *Powell v. Alabama,* 287 U.S. 45, 60 (1932); O'Connor, *Our Judicial Federalism,* 35 Case W. Res. L. Rev. 1, 5–6 (1984–85). There is, however, a question whether this court's opinion rests on adequate and independent state grounds. *See Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469 (1983).

[8] For a discussion of state courts' applying a more stringent rational basis test under the state constitution than under the federal constitution, *see, e.g.,* Kirby, *Expansive Judicial Review of Economic Regulation under State Constitutions,* in Developments in State Constitutional Law: The Williamsburg Conference 94 (B. McGraw ed. 1985); Bennett, *"Mere" Rationality in Constitutional Law: Judicial Review and Democratic Theory,* 67 Calif. L. Rev. 1049 (1979); Linde, *Due Process of Lawmaking,* 55 Neb. L. Rev. 197 (1976).

STEINMETZ, J. *(concurring in part, dissenting in part)*. I agree with the majority's conclusion that the legislation prescribing special procedures for the siting and construction of the Menomonee Valley prison violate equal protection. I disagree, however, with the majority's conclusion that the substantive decision to site a prison in the Menomonee Valley is not a private or local law which violates art. IV, sec. 18. I agree with the court of appeals that the specific designation of the Menomonee Valley site is a local or private law, and therefore it cannot be joined in a bill with other subjects and the subject must be expressed in the title of the bill. Accordingly, I would invalidate the designation of the Menomonee Valley prison site, as well as the special procedures regulating the construction of the prison. I do not conclude, however, that the legislature absolutely is prohibited from siting a prison in the Menomonee Valley. Article IV, sec. 18 of the Wisconsin Constitution does not absolutely proscribe private or local laws, but only imposes a special procedure for enactment of such laws.

The decision in *Monka v. State Conservation Comm.,* 202 Wis. 39, 231 N.W. 273 (1930), provides the key to defining a private or local law. The Department of Health and Social Services interprets this decision to mean that any legislation affecting a statewide interest is not a private or local law, even if it operates territorially upon a limited section of the state. The department relies upon the following statement in *Monka,* 202 Wis. at 42:

> "All that is held by the state, as proprietor, trustee, or in some governmental capacity, is a matter of general and state-wide concern, wherever located, and whenever it constitutes the subject of proposed

legislation the bill relating thereto is not merely a matter of local interest or concern, or a merely 'local' bill, within the meaning of sec. 18, art. IV, Const."

This interpretation of *Monka* derives from the court's decision in *Soo Line R. Co. v. Transportation Dept.,* 101 Wis. 2d 64, 303 N.W.2d 626 (1981):

"In *Monka* the court rejected plaintiff's contention that a law applicable only to Lake Michigan and not to all outlying waters was a local law. The court concluded that a law applicable to Lake Michigan was not a 'local law' merely because it operates only upon a particular section of the state. Where the subject matter of the enactment is of general and state-wide concern, the court held the law is not a local bill within the meaning of sec. 18, art. IV. The court expressly stated that it was supplementing the definition of local law as set forth in *Isenring,* to state that the court considered the operation of a bill to extend to the whole state 'when the subject thereof is such that the state itself has an interest therein as proprietor, or as trustee, or in its governmental capacity, for the benefit or in the interest of the general public.' *Monka, supra,* 202 Wis. at 46."

The department has not misquoted the *Monka* decision. It has, however, construed the quoted material from that decision out of context. The following additional language also appears in *Monka* and is crucial to any generalization about the holding in that decision:

"We approve the conclusion [in *Milwaukee County v. Isenring,* 109 Wis. 9, 85 N.W. 131 (1901)] that—
" 'An act is "general" as contradistinguished from and inconsistent with "local," in the sense the

latter term is used in sec. 18, art. IV, of the constitution, only when its operation extends to the whole state, *or perhaps to the whole of some class of localities therein which the legislature may constitutionally make upon the principles recognized and approved for the classification of cities for the purpose of general legislation.'*

"However, the writer of the opinion in that case does not seem to have taken into contemplation the class of legislation, if general, state-wide interest and character, with which we are concerned in this action. Supplementing the conclusion there stated, we now add that the operation of a bill is considered to extend to the whole state, so that it is not a mere local bill, when the subject thereof is such that the state itself has an interest therein as proprietor, or as trustee, or in its governmental capacity, for the benefit or in the interest of the general public. *That, of course, does not include a bill which merely imposes a burden or confers a benefit upon specified persons or localities, which do not constitute a legitimate class for the purpose of general legislation under the established principles of classification of cities for such purpose.*" 202 Wis. at 45–46. (Emphasis added.)

I construe this passage to mean that legislation affecting a statewide interest is not necessarily a local law, even if it operates on a limited area of the state. However, the passage also states that legislation affecting a statewide interest is not necessarily a general law. The test that *Monka* establishes for a local or private law is whether the legislation imposes a burden or confers a benefit upon persons or localities "which do not constitute a legitimate class for the purpose of general legislation under the established principles of classification of cities for such purpose." The department ig-

nores this unambiguous and decisive qualification of the *Monka* passage on which it relies.

The rules relating to the classification of cities were first stated in *Johnson v. Milwaukee,* 88 Wis. 383, 390–92, 60 N.W. 270 (1894). The court held in that decision that: (1) a classification must be based upon substantial distinctions which make one class really different from another; (2) the classification adopted must be germane to the purpose of the law; (3) the classification must not be based upon existing circumstances only. It must not be so constituted as to preclude addition to the numbers within the class; and (4) to whatsoever class a law may apply, it must apply equally to each member thereof. A fifth test was added to this list in *State ex rel. Risch v. Trustees,* 121 Wis. 44, 55, 98 N.W. 954 (1904): The characteristics of each class should be so far different from these other classes as to reasonably suggest, considering the public good, the need for substantially different legislation.

This court has applied the five factor test in cases subsequent to *Monka* to decide the private or local law issue. *Lamasco Realty Co. v. Milwaukee,* 242 Wis. 357, 375–77, 8 N.W.2d 372, 8 N.W.2d 865 (1943), applied this test to determine whether a law was private or local under art. IV, sec. 18. *Whitefish Bay v. Milwaukee County,* 224 Wis. 373, 377, 271 N.W. 416 (1937), also held that the basis of classification, whether it be population, area, or some other basis, must be germane to the purpose of the law. *Columbia County v. Wisconsin Retirement Fund,* 17 Wis. 2d 310, 321, 116 N.W.2d 142 (1962), also evaluated the appropriateness of a classification in applying art. IV, sec. 18. These later cases have special significance because the court decided

them after *Monka* and applied the classification test which I believe *Monka* mandates.

I recognize that the five factor test has been applied only as a guide for evaluating classifications and not as an absolutely unbending rule. For example, a statute affecting a closed class is not necessarily unconstitutional if the classification is germane to the unique problems of the class. Thus, *Lamasco Realty,* 242 Wis. at 377, discusses the appropriateness of Milwaukee as the basis of a legislative classification:

> "It is a well-known fact that Milwaukee is the only city of the first class in the state; that it is not probable that that class will be augmented at any time within the foreseeable future, nevertheless the requirements of a metropolitan city like Milwaukee as against the smaller municipal corporations of the state are so obvious that any other result would be opposed to the public welfare."

Nonetheless, I consider the five factors to provide a useful set of inquiries to evaluate a legislative classification in order to determine whether it arbitrarily confers benefits or imposes burdens. In *Madison Metropolitan Sewerage Dist. v. Stein,* 47 Wis. 2d 349, 359, 177 N.W.2d 131 (1970), the court summarized the ultimate distinction between an appropriate municipal classification and an inappropriate classification:

> " 'A law is special as opposed to general if, by reason of some intrinsic limitation on its scope of application, it is *arbitrarily* made to apply to some particular thing, location, person or group of persons and thereby grants privileges or imposes burdens which, but for the limitation, would apply to a larger class, each member bearing the same relationship to the subject matter of the law in question.

More specifically, a law pertaining to municipalities is special if, by reason of its being made applicable to a particular municipality or group of municipalities, it *arbitrarily* grants privileges or imposes burdens upon less than all the municipalities to which the particular law would naturally apply in the absence of the limitation. Thus, legislation made applicable on its face to a named city, or to a group of cities identified by their population or by some other named characteristic, is potentially special, depending upon whether or not the particular restrictive characteristic is deemed to be arbitrarily selected.' " Quoting from John M. Winters, *Classification of Municipalities,* 57 Nw. U. L. Rev. (1962).

The majority disclaims any relationship between equal protection analysis and analysis of a private or local law under art. IV, sec. 18. This distinction and separate treatment does not hold true when considering the historical basis for art. IV, sec. 18. In prohibiting private or local legislation, unless separately identified, there is an inherent requirement of treating classes or people equally so that one group does not receive separate beneficial or harmful treatment without a separate bill being identified and considered. That is another but more selective treatment of equal protection but with special constitutional protections.

Because I believe that *Monka* and subsequent decisions by this court unambiguously define a private or local law in terms of the appropriateness of the classification, I cannot accept the majority's test for a local or private law. The majority concludes that the appropriateness of dissimilar treatment of private or local interests is not a relevant inquiry under art. IV, sec. 18. At pages 113–114. I find this conclusion to be novel and irreconcilable with the purpose of art. IV, sec. 18, which

the majority correctly defines as "to avoid the specter of favoritism and discrimination, a potential which is inherent in laws of limited applicability." At pages 107–108. The problem of discriminatory treatment, by conferring benefits or burdens on too narrow a basis, is the essence of the limitations on private or local laws. Therefore, I would continue to evaluate such laws under the test of *Monka.*

I also believe that the majority's substitute test for a private or local law will involve the court in legislative second guessing which will create a multitude of litigation. The majority states that a law conferring special benefits or burdens is private or local unless the legislation involves a matter of statewide interest and the legislation will have a direct and immediate effect on the statewide interest. At pages 114–115. I believe that the "direct and immediate effect" test is vague and requires the court to evaluate the effectiveness of the legislative means in relationship to the legislative purpose. I do not believe that this is a proper issue for judicial determination. The test is imprecise and ignores competing legislative goals, such as fiscal constraints, which may limit the "direct and immediate effect" of legislation.

More importantly, I do not believe that the "direct and immediate effect" test has any relevance to the interests protected by art IV, sec. 18. The fact that legislation may be effective does not ease the burden on local or private interests. Therefore, consistent with the purpose of art. IV, sec. 18, I would determine whether a bill is local or private on the basis of whether it "imposes a burden or confers a benefit upon specified persons or localities, which do not constitute a legitimate class for the purpose of general legislation." *Monka,* 202 Wis. at 46. This is the test the court has

previously applied; it is a more relevant test; it is an easier test to apply; and it does not require the court to determine some arbitrary level of statutory effectiveness.

The majority's working definition of a direct and immediate effect also is too impracticable to be useful. The test apparently requires a systemwide impact on a matter of state interest. This requirement is indicated by the majority's application of the test to the facts of the *Soo Line* decision. The majority acknowledges that the construction of railroad crossings is a matter of a "state responsibility of statewide dimension." At page 117. The majority concludes, however, that "[t]he espoused statewide concern for highway safety was not sufficiently specific, nor was the effect on statewide highway safety direct and immediate." At page 117. The majority apparently reasons that legislation does not have a direct and immediate effect unless it impacts on the entire subject matter of statewide interest. Under this definition, any geographically specific location for highway construction set forth in untitled legislation with other matters would be a private or local law. A specific bridge, crossing or stretch of highway would never have a direct and immediate effect on the entire subject matter of highway safety. Not even I-94 construction could qualify as a subject matter which has a direct and immediate effect on "statewide highway safety." I disagree that legislation must have a systemwide impact in order to have a direct and immediate effect on a matter of statewide interest.

Even applying the majority's test, it means that a bill which does not regulate the entire subject of concern, for example, highway safety, and which imposes site-specific burdens, is a private or local law which

cannot be included in the budget bill. Applying this reasoning to the facts of this case, the prison siting legislation violates art. IV, sec. 18. The legislation relates to a subject of statewide concern, prison overcrowding, but it does not regulate the entire subject. It deals only with a specific part of the problem, a single prison in the Menomonee Valley in Milwaukee. This prison legislation is every bit as local or private as the railroad crossing at issue in *Soo Line*. The legislation by its terms applies to a prison to be:

> "[L]ocated in Milwaukee in the area bounded on the north by highway I 94, on the south and west by the Menominee [statutory spelling] river and on the east by 35th street on property owned by the Milwaukee road railroad on March 28, 1983. The department may acquire additional land owned by the Milwaukee road railroad on March 28, 1983, on the west and south sides of and contiguous to the Menominee river." 1983 Wis. Act 27, sec. 953p.

I also disagree with the majority's "direct and immediate effect" test because it is essentially a balancing test to determine whether the statewide benefits outweigh the effect of the legislation on local or private interests. If the legislation is of statewide interest with statewide effect, it can never be a private or local bill under art. IV, sec. 18 of the Wisconsin Constitution, no matter what effect it has on the locality or individuals involved. Under this test, legislation specifically siting a toxic waste dump, or a maximum security prison as in this case, would not be a local or private law. I disagree with this analysis and would abide by the court's reasoning in *Monka*. I disagree that a new test is needed, and I find it surprising that the court only now has discovered the true test for analyzing a constitu-

tional provision that has existed since 1848 and has been previously challenged.

The majority's test for a private or local law will not permit accountability on issues affecting local or private interests. The test still requires legislators to vote for a comprehensive budget bill with its many concerns and fiscal necessities without voting directly on matters of private or local effect. Accountability is sacrificed, not because legislators are unaware of the private or local provisions of the budget bill, but because they cannot vote their convictions on such provisions without affecting the entire budget bill. Contrary to the majority's conclusion, therefore, a legislator could credibly claim to oppose a local or private provision, despite voting for the entire budget bill.

Applying the *Monka* test for a private or local law to the present case, I conclude that the entire prison siting legislation is unconstitutional. I do not dispute that the issue of prison siting affects a statewide concern. That conclusion, however, is not dispositive of the constitutional issue. Although the subject of prison siting may be of statewide interest, I consider the imposition of special burdens on the plaintiffs in this case in order to facilitate construction of a prison to be an impermissible classification.

First, the legislation severely curtails the procedural requirements for siting a prison in Milwaukee. For example, the legislation only provides for an informational hearing rather than a full contested hearing in cases to which the statute applies. The substantial detriment that this distinction imposes on Milwaukee residents, to the exclusion of all other residents, is thoroughly discussed in the majority opinion. The purported rationale for this special burden is the need to

respond expeditiously to prison overcrowding in Wisconsin. The problem of prison overcrowding is alleged to be most severe in southeast Wisconsin and the goals of the criminal justice system are said to be best served by community-based prisons. It is not that prison overcrowding is most severe in southeast Wisconsin, but rather that the potential prison population is greatest from the urban section of southeast Wisconsin. The legislation imposes the special prison siting provisions on any new metropolitan correctional institute which is specifically designated by the legislature, by statute, between July 2, 1983, and January 1, 1985, in a city having a population of 500,000 or more. The legislation therefore creates a classification for prison siting that is based on three factors: (1) population, (2) time, and (3) statutory designation. The decisive question in this case is whether these classifying criteria are germane to the purpose of the legislation or arbitrarily impose burdens on Milwaukee residents.

I do not believe that the classification is germane to the legislative purpose. First, the legislation classifies on the basis of population, rather than specifically identifying the locations where prison overcrowding is most in need of relief. Assuming that the greatest need for new prisons is limited geographically to Milwaukee county, the legislation should classify on the basis of geography rather than population. In *Whitefish Bay v. Milwaukee County,* 224 Wis. at 377–79, this court considered a very similar attempt to legislate for a specific area, *i.e.,* Milwaukee county, while stating the basis for the classification in terms of population. The purpose of the legislation, however, was unrelated to a classification by population. Peculiarities relating to the City of Milwaukee's charter motivated the legislation in-

volved in that case and not the special problems of an urban population. The court accordingly ruled the statute unconstitutional. Similarly, in *Lamasco Realty,* 242 Wis. at 377, the court approved of classifications by population when unique problems are associated with the population size, for example, problems of urbanization. *Columbia County,* 17 Wis. 2d at 322, also noted that it is constitutional to classify cities according to population on the theory that metropolitan problems deserve a special classification under a general law.

In this case, the purpose of the statute relates to the alleged need for a community-based prison in Milwaukee. This is not a peculiar problem of Milwaukee's size, however, as the Flad Report indicates that prisons are also needed elsewhere in the state. For example, the Flad Report recommended that a maximum security prison also be built in the Racine-Kenosha area. The exclusion of any prison site in that area from this legislative restriction illustrates the statute's arbitrary limitation to cities with a population of 500,000 or more. Also, there is no reason to believe that expedited procedures are especially needed in large cities based on unique opposition to prisons. Opposition to prison siting is not a problem specifically related to population size.

The use of a population criterion to expedite prison construction also is inappropriate because the need for new prisons is not a unique Milwaukee problem. The Flad Report recommended construction of 23 correctional facilities throughout the state. The majority of the new prisons were recommended for the southeast part of the state. The Flad Report did not single out Milwaukee from this broader geographical region for

all of such prison construction, however. In fact, within the various regions, the Flad Report made no site specific recommendations. The limitation of the statutory restrictions in this case only to Milwaukee, therefore, is arbitrary. There is no reason why a prison to be built within Milwaukee county, but outside the city of Milwaukee, should be treated differently than the Menomonee Valley prison. There is also no justification why any prison built in the Racine-Kenosha area should be treated differently than this prison. The need for this prison to be in Milwaukee is nowhere shown to be greater than the need for other recommended prisons. All the recommended correctional facilities affect the statewide overcrowding problem, thereby making it arbitrary to lessen the procedural requirements for only one facility.

The other classifying criteria, time and statutory designation, are also not germane to the purpose of the legislation. The special siting procedures apply only to prisons designated between July 2, 1983, and January 1, 1985. This small window of applicability is not rationally related to the purpose of alleviating prison overcrowding. Time as a factor has no inherent relationship to alleviating prison overcrowding. By itself, the passage of time will not solve the problem of excess prisoner population. The state, by its legislature or its agencies, must take affirmative steps to build prisons. Such steps will not necessarily be taken in a year and one-half. Thus, a classification based solely on the time of prison siting, rather than the magnitude of the prison population problem, is not rationally related to its purpose.

The further statutory limitation to prisons designated by the legislature by statute also is a ruse to arbi-

trarily discriminate against Milwaukee. As a practical matter, most correctional facilities are designated by agency decision. Thus, the limitation of the special siting provisions to statutory designations has no relevance to the problem of prison overcrowding. Even agency siting decisions made during the period of the statute's applicability are not covered by the expedited procedure. This limitation has no relationship to the purpose of alleviating prison overcrowding. It is simply further evidence of the improper and transparent attempt to limit the expedited siting procedure to the Menomonee Valley prison. Because there is no unique reason for expediting this one prison, I conclude that the classification is improper and renders the legislation regulating the procedural aspects of the prison construction an unconstitutional private or local law.

Whether the specific site designation also violates the local or private law provision of the Wisconsin Constitution is a more difficult question. The department contends that not every site-specific appropriation is a private or local law requiring passage in a separately titled bill. The department's argument essentially is that the business of budgeting governmental expenses requires a comprehensive appropriation process. The department then concludes that requiring separate legislation for site-specific appropriations will fragment the budgeting process. The constitutional issue implicated by site-specific appropriations, however, must be given precedence over governmental convenience. Thus, the issue is simply whether the specific site designation confers benefits or imposes burdens on an improperly narrow class of persons.

The intensity of the local opposition to the prison siting legislation indicates that it does not confer a spe-

cial benefit on these plaintiffs. Whether the legislation designating a specific prison site imposes burdens on legally recognizable interests of the plaintiffs is more complicated. The plaintiffs allege that construction of the prison in the Menomonee Valley will affect environmental concerns. In the absence of a statutory basis, the environmental effects of a state building project, not constituting a nuisance, would not be legally recognized burdens for purposes of art. IV, sec. 18. Significantly, however, specific statutory recognition of environmental concerns exists in Wisconsin. In the companion case to this one, *Milwaukee Brewers Baseball Club, et al. v. Wisconsin Department of Health & Social Services,* 130 Wis. 2d 56, 387 N.W.2d 245 (1986), we specifically recognized that "allegations of injuries to aesthetic, conservational, environmental, health, and recreational interests" are protected by the Wisconsin Environmental Protection Act, sec. 1.11, Stats. No. 85–0855 at page 65. Thus, when siting legislation affects environmental interests, the legislation imposes special burdens if it deprives affected persons of the protection to which other persons are entitled by WEPA.

ply an appropriation measure, whereby funds are allocated in a comprehensive budget bill for a prison that had already been approved. The Menomonee Valley siting legislation is substantive legislation authorizing a specific project. Section 46.05(1*o*)(a), Stats., directs the department to establish a prison at a specific location. Without the authorizing provisions included in the appropriations bill, the Menomonee Valley prison decision would not exist.

Including a state building site in substantive legislation has a major limiting effect on the rights of affected parties. Section 1.11(2)(c)3, Stats., requires consideration of alternatives to a proposed action in an environmental impact statement (EIS). In the companion *Brewers* case, in which the court evaluated the adequacy of the department's EIS on the Menomonee Valley site, we noted that "several courts have found the description of alternatives to be the heart of the environmental impact statement." No. 85–0855 at page 73. Nonetheless, the court concluded in that case that an EIS does not have to consider alternatives when the legislature has designated a specific site for a prison. No. 85–0855 at pages 74–75. This holding severely limits the usual rights of objectors to major state building projects. Because the limitation only applies to persons affected by the Menomonee Valley prison site, I consider the classification to be too narrow. Therefore, the siting legislation also is an improper local or private law. I note that the remedy for this defect is separate legislation for statutorily designated building projects which cause major environmental impacts. This result is reasonable given the absence of the consideration of alternatives in the EIS. Designation by separate legislation promotes the underlying goal of legislative accountability.

The siting designation also is a private or local law because it constitutes a decision to buy a specific entity's property. Section 46.05(1*o*)(a), Stats., directs the department to buy the designated property from the Milwaukee Railroad Company. There can be no dispute that we would hold the siting legislation to be a local or private law if the railroad had brought this action. A law authorizing the state to purchase a specific enti-

ty's property epitomizes what is prohibited by art. IV, sec. 18. Furthermore, the ultimate characterization of the law as a private bill is not dependent upon the identity of the objecting party. The siting bill either is or is not a private law, and the answer to that question does not depend on who is asking for a determination. The status of the parties may affect standing, but it does not affect the definition of a private or local law.

The plaintiffs have standing to object to the constitutionality of the siting bill, in any event. The test for standing to make a constitutional challenge to a statute is stated in *St. ex rel. 1st Nat. Bank v. M&I Peoples Bank,* 95 Wis. 2d 303, 308–09, 290 N.W.2d 321 (1980), to include two inquiries: (1) whether the plaintiff personally has suffered some threatened or actual injury; and (2) whether the constitutional provision on which the claim rests properly can be understood to grant persons in the plaintiffs' positions a right to judicial relief. In the companion *Brewers* case, this court specifically held that the threatened environmental effects of the Menomonee Valley prison satisfy the first standing inquiry. No. 85–0855 at pages 69–70.

The second prong of the standing test also is satisfied because art. IV, sec. 18 obviously was intended to protect against "sweetheart deals" between the legislature and private individuals or entities. I acknowledge that a legislative decision to purchase an individual's property may be an unwanted decision—if the property owner does not want to sell. On the other hand, the decision to buy may be welcome—if the owner desires to sell as here. Furthermore, the state's jurisdictional offer to purchase under its eminent domain powers cannot be challenged by anyone except the property owner. Finally, as noted above, the legislature

does not have to consider alternative sites in an EIS when it statutorily designates project sites. In these circumstances, I believe art. IV, sec. 18 was intended to permit these plaintiffs to challenge the site designation bill. It is reasonable for all parties involved to require the legislature to make site selection and land purchase decisions in separate legislation. Legislative accountability is facilitated by this process, as required by art. IV, sec. 18. The purpose of that constitutional provision requires that someone other than the property owner also have standing to challenge laws directing the purchase of specific property. Sweetheart deals otherwise would be inscrutable. For this reason, I also believe that the plaintiffs have standing and that the purchase decision is an improper local or private law.

I conclude this discussion of the private or local law issue by noting that the analysis is consistent with the purpose of art. IV, sec. 18. That constitutional provision was adopted as a result of public reaction against the use of special legislation on substantive matters, which abuse amounted to the exercise of judicial power, such as by enacting laws which "fixed penalties, awarded new court trials, adjusted solvencies and granted divorces." Hurst, *The Growth of American Law: The Law Makers,* 79 (1950). In *Milwaukee County v. Isenring,* 109 Wis. 9, 23, 85 N.W. 131 (1901), this court further stated the laudatory purpose of art. IV, sec. 18 :

> "We are dealing with an important constitutional restriction upon legislative power. Courts that refer to such an objection to a law as the one here presented as technical, misconceive the situation. The framers of the constitution, in adopting sec. 18, art. IV, intended to guard against the danger of legisla-

tion, affecting private or local interests, being smuggled through the legislature under misleading titles, by requiring every bill affecting such interests to be under a title likely to call attention of the lawmakers to its character, and likewise the attention of the people affected, to the end that every member of *the legislature may intelligently participate in considering such bill and all objections thereto may be presented."* (Emphasis added.)

The *Isenring* case was decided in 1901 before the modern, sophisticated maneuver of including substantive law in budget bills became common. The conclusion in *Isenring,* however, is perhaps even more appropriate today in requiring every member of the legislature to intelligently and independently consider bills of a substantive nature so that all objections may be presented while considering the issue, with legislators ultimately casting a vote for or against it. When a local bill is included in the budget, legislators are not required to vote yes or no on the specific issues, but only cast a vote for or against the entire budget bill, which contains many necessary fiscal matters. It would be more conducive to representative government if legislators were required to specially vote on a local issue, such as the siting of this prison, and therefore have to face their constituents in regard to their vote. That is what the court held in the *Isenring* case, and we have never retreated from that wise interpretation of art. IV, sec. 18.

Finally, accepting the *Soo Line* test for a local or private law, it would not validate the legislation at issue in this case. The department urges us to apply the *Soo Line* test to decide whether the prison siting legislation violates art. IV, sec. 18. The court's entire con-

clusory reasoning in that case consisted of the following paragraphs:

> "It is difficult to conceive of a legislative enactment more particularly addressed to a specific geographical location or a specific entity. In light of the definition of private or local law set forth in our prior cases and the rationale of sec. 18, art. IV, Wis. Const., we conclude that sec. 923(48)(a) is a private or local law.
>
> "We must now determine whether ch. 418, Laws of 1977, meets the requirements which sec. 18, art. IV, Wis. Const., imposes on sec. 923(48)(a), a private or local enactment. The law cannot embrace more than one subject and the subject must be expressed in the title.
>
> "Ch. 418, Laws of 1977, is, as we noted previously, the budget review bill. Without elaborating, it is obvious from the nature of the act, the length of the act and the numerous sections in the act, that the budget review bill embraces many subjects in addition to the question of the Soo Line Railroad crossing." 101 Wis. 2d at 77.

This simple statement of the rule of law would, if applied, lead to the conclusion that the designation of the prison siting is a private or local law.

Under any analysis, therefore, the prison siting legislation is a private or local law that cannot be included in the budget bill. The 1983 budget bill is an omnibus statute of more than 400 pages embracing a broad range of subjects, including one site-specific provision, the prison siting legislation. Nothing could be more clear, when avoiding the politics of the issue, that this is a local bill prohibited by the Wisconsin Constitution. It does not do to say that this conclusion will stall construction of the Menomonee Valley prison, because

to expedite construction contrary to constitutional guarantees allows the end to justify the means. Also, the legislature is not prohibited from funding the prison in the budget bill. It simply cannot designate the site or the site review procedures in the budget bill. Accordingly, I would invalidate the site designation provisions of the budget bill and therefore dissent. I also concur with the majority's decision as to the procedural provisions of the bill being unconstitutional as a violation of equal protection under the Wisconsin Constitution.

LOUIS J. CECI, J. *(concurring in part and dissenting in part).* I agree with the result reached by the majority with respect to its equal protection analysis and holding. I disagree, however, with the majority's conclusion that the prison-siting legislation is not a local law. Instead, I would find that the inclusion of the prison-siting provision in the 1983 budget bill (1983 Wis. Act 27, sec. 953p) violated art. IV, sec. 18 of the Wisconsin Constitution. I write separately to voice my strong objection to the method employed by the legislature for the siting of the prison. The prison-siting legislation, buried deep within the budget bill, represents the very worst of the logrolling and railroading practices which have become all too commonplace in the legislature.

Article IV, sec. 18 of the constitution states:

"**Title of private bills.** Section 18. No private or local bill which may be passed by the legislature shall embrace more than one subject, and that shall be expressed in the title."

The purpose of sec. 18 is to guard against the danger of private or local legislation being "smuggled through

the legislature" through the use of misleading titles and to call the attention of lawmakers and the public to the character of the law. *Milwaukee County v. Isenring,* 109 Wis. 9, 23, 85 N.W. 131 (1901). Section 18 "is designed to protect the public from legislative enactment of statutes whose effect is unknown to legislators and to the people of the state and to direct the legislator's attention to the proposed law to forestall improvident legislation, fraud and surprise." *Soo Line R. Co. v. Transportation Dept.,* 101 Wis. 2d 64, 72, 303 N.W.2d 626 (1981).

The very design of art. IV, sec. 18 is disregarded in the legislative practice whereby a provision such as the prison-siting legislation is included in a budget bill. Such a practice breeds unaccountable representation: it necessarily forces a legislator to vote only once on two separate matters. A legislator is forced to vote on a matter of statewide importance and prominence— the budget in this instance—the same way in which he or she will vote on a wholly unrelated subject—here, the siting of a prison in the Menomonee Valley. An affirmative or negative vote on the overall bill necessitates the vote extending to all subject matter within the bill. I find such a practice to be deplorable and untrue to the spirit of art. IV, sec. 18. Certainly the representatives' respective constituencies, which may well have different opinions about the logrolled issues, deserve to have their views be fully represented by separate voting on separate issues.

We do not require that the general electorate vote a straight party ticket; we should not tolerate legislative practices which dictate that only a single vote be cast on wholly separate issues. Such a practice is, at best, a modified form of logrolling, which is prohibited

by statute.[1] Such a practice destroys the accountability of our representatives and reduces the legislature to an internally acquiescent institution, unresponsive to the constituency it purports to represent.

I now turn to the test enunciated by the majority for determining whether a bill is private or local. I agree with the elements of the test, but not with the application or result of the test as applied to the facts of this case. As the court of appeals stated, the instant case contains facts which dictate the same result as was found in *Soo Line*. In *Soo Line,* this court held that the provision at issue was a private or local law. *Soo Line,* 101 Wis. 2d at 77, 78.

The majority correctly concludes that *Soo Line* stands for the proposition that a geographic- or entity-specific provision in a bill does not render the bill one of statewide interest merely because the provision relates in a tangential way to a matter of state responsibility of statewide dimension. "If the provision is geographic or entity specific," the provision "must have a direct and immediate effect on a specific statewide con-

---

[1] Section 13.05, Stats., provides:

"**Logrolling prohibited.** Any member of the legislature who gives, offers or promises to give his vote or influence in favor of or against any measure or proposition pending or proposed to be introduced, in the legislature in consideration or upon condition that any other person elected to the same legislature will give or will promise or agree to give his vote or influence in favor of or against any other measure or proposition pending or proposed to be introduced in such legislature, or who gives, offers or promises to give his vote or influence for or against any measure on condition that any other member will give his vote or influence in favor of any change in any other bill pending or proposed to be introduced in the legislature may be fined not less than $500 nor more than $1,000 or imprisoned not less than one year nor more than 3 years or both."

cern or interest" before the bill will be considered to be of statewide dimension and not be bound by the requirements of art. IV, sec. 18. At pages 114–115. The majority concludes that although sec. 46.05(1*o*) (a), Stats., is a geographic-specific provision, the provision nevertheless has a direct and immediate effect on a matter of statewide concern. *Id.* at 120. I respectfully disagree.

A new metropolitan prison in the Menomonee Valley certainly would affect the overcrowded conditions of the Wisconsin correctional system, which is a matter of statewide concern, much like the applicable *Soo Line* provision dealing with the construction of a railroad crossing at a particular point would have marginally affected highway safety, also an area of statewide concern. Similar to *Soo Line,* the prison-siting legislation does not have a *direct and immediate* effect on the statewide interest which the provision allegedly addresses. The effect on prison overcrowding is secondary.

The direct and immediate effect of the provision may be discerned from the purpose of the siting provision. The legislature expressly found "prison overcrowding is a critical problem in this state which restricts the options available to judges, prosecutors and prison officials." 1983 Wis. Act 27, sec. 2020(32g)(a). However, if alleviation of general prison overcrowding were the primary and direct objective of the prison-siting legislation, then the legislature could have authorized the prison's siting in any geographic area of the state. That the legislature made the prison bill site-specific to the Menomonee Valley is significant. It indicates that the legislature was concerned with placing the prison in a specific locality of the state, probably based on the findings of the 1977 Flad Report, which

159

recommended that the state correctional system include facilities which would incarcerate the criminal offenders close to family and friends. But it is exactly the legislature's interest in geographic specificity for a prison site which necessitates the protections of art. IV, sec. 18 of the constitution. As the majority said, the three underlying purposes of art. IV, sec. 18 are:

> "1) to encourage the legislature to devote its time to the state at large, its primary responsibility; 2) to avoid the specter of favoritism and discrimination, a potential which is inherent in laws of limited applicability; and 3) to alert the public through its elected representatives to the real nature and subject matter of legislation under consideration." At pages 107–108.

Although the general organization of the correctional system is a matter of statewide concern, it is a more difficult proposition to conclude, as the majority implicitly does, that the matter of housing Milwaukee-area prisoners close to home is a matter of statewide concern or that such a concern has statewide impact on the overall correctional system. It is even more tenuous to conclude that the direct and immediate effect of the prison-siting legislation is directed toward a matter of statewide concern. In my opinion, the direct and immediate effect of the specificity of the prison-siting legislation is to incarcerate Milwaukee-area prisoners close to their families and friends. This direct and immediate effect is not a matter of statewide concern, but only relates to one specific aspect of the overall correctional system, much like the at-grade crossing legislation of *Soo Line* concerned only a tangential, fractional component of the overall state interest in highway safety.

■■■■■■■■■■

The majority concludes that the effect of the site-specific legislation "will be direct because the provision causes a prison to be built in the Menomonee Valley." At page 120. But the *Soo Line* at-grade provision would also have had a direct effect under this analysis, because the provision would have caused an at-grade crossing to be built at the specified location. The immediate effect of the new prison is not that it will provide additional prisoner space, at pages 120–121, for the prison could have been sited anywhere in the state and still have had the same effect. Rather, the specificity with which the legislature sited the new prison indicates that the immediate effect is to give meaning to the recommendation of the Flad Report that urban prisoners be incarcerated near their urban environment.

While the prison system is generally a matter of statewide concern, the building of a prison in the Menomonee Valley to allow prisoners from that area to be maintained in that area is not a matter of statewide importance. That is, there is no statewide interest in assuring that Milwaukee-area prisoners are maintained in the Menomonee Valley in the city of Milwaukee. A provision such as sec. 46.05(1*o*)(a), Stats., gives direct and immediate effect only to the Flad Report recommendation and one part of the prison system, not to the system as a whole. Only the secondary and tertiary effects have an impact on the entire prison system in relation to system-wide overcrowding, for example.

I also disagree with the majority's subjective comments concerning the local law issue. The majority states that "[t]he real nature and subject matter of this provision had to be known, and this, in turn, assured accountability." At page 120. But the test established by the majority is an objective test, not a subjective one.

161

To conjecture as to what was actually known, either by the legislators or by the public, disserves the majority's own test and reduces the question of what is a local or private law to the unworkable inquiry of what the legislature or public knows concerning a particular bill.

I agree with the majority that many legislative provisions within the budget bill may not withstand constitutional analysis under the majority's test. At page 121. Those hypothetical questions are not before us at this time. I conclude, however, that the provision at issue here does not pass the majority's own test. I respectfully dissent from its local law analysis.

BABLITCH, J. *(concurring)*. This concurring opinion addresses only the dissent of Justice Abrahamson. Although it is unusual for the author of a majority opinion to also write a concurrence, it is not without precedent. Both the substance and the tone of that dissenting opinion deserve response.

The dissent very seriously misstates the holding of the majority opinion as well as its effect. The dissent states, "[w]ith this opinion the court usurps the legislative prerogative . . . regarding the location of prisons and the urgency of prison construction." Pages 122–123. The majority opinion does no such thing. That statement in the dissent ignores, first, that the legislative prerogative to locate prisons remains intact. The legislative provision directing DHSS to construct a prison in the Menomonee Valley remains fully in effect. Second, that statement ignores the fact that the majority opinion does not deny the legislature the power to provide expedited procedures to meet the state's urgent need for prison space. The majority opinion explicitly says

that the legislature, if it chooses to provide expedited procedures, must do so consistently with equal protection. Had the legislature chosen to apply these truncated procedures to all prison construction in the state, or even just to prison construction in southeast Wisconsin, the majority opinion makes it very clear that the constitutional guarantees of equal protection would not have been offended.

The dissenting opinion incorrectly states: "The majority opinion fails to state clearly and consistently what it views as the legislative objective and means. ..." At page 123. I refer the dissenting justice to pages 99–100 of the majority opinion which states: "In other words, the *objective* was a prison in downtown Milwaukee in order to meet the critical statewide need for more prison space; the *means* chosen to reach that objective was a truncated WEPA and judicial review process. . . . We conclude there is no rational basis . . . to support the *means* which the legislature chose to accomplish its objective." (Emphasis added.) This language could not be clearer.

The dissent makes the assertion that, "[t]he legislature has prescribed noncontested hearings in many instances, and both the contested and informational hearings provide interested persons with a fair, meaningful hearing. This prison siting legislation just adds another exception to the long list of exceptions to the contested hearing ...." Page 124. The only relevant comparison would be between hearing provisions for the Menomonee Valley prison and hearing provisions for other prison construction in the state. The only medium/maximum prison constructed in this state of recent vintage was the prison at Portage. A contested case hearing was provided.

Finally, the dissent says, in respect to the test that is to be applied to geographic, entity and individually specific legislative provisions, that: "In the guise of interpreting art. IV, sec. 18, the court attempts to promulgate a legislative form manual. The court puts the legislature on notice that the court is readying its pens, pencils, and word processors to use art. IV, sec. 18, aggressively to monitor the legislative process." Page 132. Not only is that statement unwarranted, it ignores the history of difficulty that this court and the courts of other states have experienced in attempting to put meaning into those words of the constitution. The majority has accepted the challenge and fashioned a reasonable test in this case that, if followed, will eliminate much of the confusion growing from earlier cases.

In 1981, the author of the dissent wrote the majority opinion for this court in *Soo Line R. Co. v. Transportation Dept.,* 101 Wis. 2d 64, 303 N.W.2d 626 (1981). That opinion recognized that deciding what is a private or local law has been difficult and that an accurate, comprehensive definition of the phrase "private or local" has eluded this court and other states. *Soo Line* at 73. Nevertheless, the *Soo Line* court went on to apply the same standard balancing test which had proved so ineffective in this state as well as others. Since 1981, either the legislature did not hear the message of *Soo Line* or heard it too well. Since 1981, the legislature has inserted into the budget many legislative provisions which are arguably private or local laws.[1]

---

[1] For instance, a property tax exemption for youth hockey associations; a continuing education program for funeral directors; special treatment for a small city's sewerage plant; a property tax exemption for railroad historical societies; a claim in excess of

The dissenting opinion would render article IV, sec. 18 nothing more than a meaningless constitutional gesture. The article must be more than that. But for the article to be meaningful, this court must use a different means to test the constitutionality of these types of provisions other than the same old ineffective balancing test. We do not, as the dissent mistakenly represents, wait with ". . . pens, pencils, and word processors to use art. IV, sec. 18, aggressively to monitor the legislative process." Page 132. We trust and assume that the members of the legislature desire to be as true to their oaths of office as do the members of this court. To do so, history proves they need a more workable, understandable, analytical framework than the balancing test outlined by this court in the *Soo Line* opinion. The balancing test, in many instances, became an "eye of the beholder" test. As stated succinctly and accurately by countless legislators, " 'Pork' is what some other legislator inserts into the budget, 'good public policy' is what I insert into the budget." Because that balancing test depended so very greatly on the perspectives of those determining the weight to be applied to each side of the scale, it has proved unworkable. The obvious failure of the *Soo Line* opinion to halt legislative excursions into this constitutionally difficult area dictates the necessity for the objective framework set forth in the majority opinion.

---

$100,000 GPR for a named individual; nearly one million dollars in state aid to the World Dairy Exposition and Wisconsin Livestock Breeder's Association; an animal lab in the City of Barron; an inheritance tax exemption for MIA's; exclusion of certain students for Minnesota reciprocity. The list goes on and on. Many of these provisions survived; some did not.